# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-DP-01280-SCT

*EDDIE LEE HOWARD, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 5/25/2000 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | GARY GOODWIN |
| | ARMSTRONG WALTERS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| | MARVIN L. WHITE |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 07/24/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1.     Eddie Lee Howard, Jr., appeals his conviction of capital murder and death sentence for the 1992 rape and murder of Georgia Kemp. Howard's first conviction and sentence were reversed and remanded for a new trial on the basis that, inter alia, he was not competent to represent himself. **Howard v. State**, 697 So. 2d 415 (Miss. 1997), *republished as corrected*, 701 So. 2d 274 (Miss. 1997). Finding no reversible error in this second direct appeal, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    On the evening of February 2, 1992, 14-year-old Paris Lowery noticed smoke emerging from the home of her neighbor, 84-year-old Georgia Kemp.  Lowery informed her mother of the smoke, and the Columbus, Mississippi, Fire Department was summoned.  The firefighters found a small smoldering fire in the living room which had burned two holes in the floor.  Stanley Clark, battalion chief with the Columbus Fire Department, found Kemp on the floor of her bedroom but was surprised because the fire did not generate enough smoke to cause death by smoke inhalation.  Another firefighter, Tony Clark, checked for vital signs and concluded that Kemp was dead.  Stanley noticed that Kemp's legs were bloodied up a bit and that she was partially exposed.  He also found a bloody knife on the bed and a telephone with its line cut.  At that point, Stanley and Tony exited the house so as not to disturb the scene.

¶3.    An investigation ensued which found that Kemp was lying on her left side, exposed from the waist down, and wearing nylon stockings.  Her nightgown had been pulled up and ripped open in the front.  Kemp had been stabbed twice in the left side of her chest, and blood was found on the sheets of the bed from the headboard to the footboard.  There was no evidence of forced entry or anything stolen from the house.

¶4.    Dr. Steven Hayne performed an autopsy on Kemp's body on February 3, 1992.  He found that Kemp had bruises and scrapes about the face, head and neck, multiple bruises to the left shin, and bite marks on the right breast, right side of the neck, and right forearm.

2

Also found were injuries to both sides of the vaginal vault, which, according to Dr. Hayne, were consistent with forced sexual intercourse. However, no semen was found, but Dr. Hayne testified that did not mean that intercourse had not taken place. In addition, Kemp suffered injuries consistent with manual strangulation, but the cause of death was the two stab wounds to the left side of the chest which caused severe internal bleeding.

¶5. Eddie Lee Howard, Jr., consented to have dental impressions taken which were made by Dr. David Curtis on February 6, 1992. Dr. Curtis noted that Howard had a removable partial denture replacing the upper four front teeth.

¶6. After Kemp's body was exhumed, Dr. Michael West, a forensic odontologist, examined the dental impressions and the bite marks on Kemp on February 7, 1992. He found that Howard's upper teeth were consistent with the mark on Kemp's arm and that both Howard's upper and lower teeth were consistent with the marks on Kemp's neck and breast.

¶7. On the morning of February 3, 1992, one day after the murder, Howard paid a visit to Kayfen Fulgham, his former girlfriend and the mother of his adult child. Fulgham noted that Howard smelled of smoke, not cigarette smoke, but "like burnt clothes or something, you know, wood, like smoke."

¶8. Howard was arrested on February 8, 1992, and, at the time, was living with his mother a couple of blocks away from Kemp. On February 13, 1992, Detective David Turner was given a note from Howard stating, "Dear Mr. Turner, I need to see you as soon as possible. It's in relation to my case." Howard was taken to Turner's office and requested that

3

Turner drive him by the crime scene to see if it would bring back some memories. Howard also told Turner the case was solved.

¶9. After Turner gave Howard an advice of rights form, Turner and Commander Donald Freshour drove Howard by Kemp's house, but Howard indicated it did not bring back any memories to him. Turner and Freshour then drove Howard past his mother's house two blocks away where he had been living and his aunt's house three blocks away. The three men then passed by Kemp's house again and returned to the Columbus Police Department. Howard was placed in Turner's office whereupon Turner testified the following transpired:

> Again he told me that the case was solved and he told me that there was–uh–five or six other individuals involved and to keep investigating the case, that I would [] find out [] their roles [] in this case. Uh–and he asked me if I thought he was [] crazy. I looked at him and I said, ["]no, man–you know, I don't think you're crazy["] and he said ["]well I'm not. I'm not crazy["] and he said ["]I had a temper and that's why this happened.["] And when he said that, I mean shock just went across my body and I felt like at that point this was the guy that had actually committed the murder.

¶10. Howard was indicted on August 13, 1992, on the charge of capital murder with an underlying felony of rape. Howard represented himself at his trial which began on May 9, 1994. The jury returned a guilty verdict after three days of trial and returned a sentence of death the same day.

¶11. Howard appealed the verdict and sentence, alleging seventeen assignments of error. *Howard v. State*, 697 So. 2d 415 (Miss. 1997), *republished as corrected*, 701 So. 2d 274 (Miss. 1997) (*Howard I*). We held that Howard's waiver of his right to counsel was not

4

voluntary, the court erred in failing to order a competency hearing before allowing Howard to represent himself, and the court's denial of Howard's request to have standby counsel deliver his closing argument violated his right to counsel. Based on those errors, we reversed the verdict and remanded for a new trial. 701 So. 2d at 288.

¶12. The new trial, this time with counsel, commenced on May 22, 2000. On the day trial began, the indictment was amended to charge Howard as a habitual offender. Howard had been sentenced in 1972 to nine years in prison for assault with intent to ravish and in 1977 to twenty-five years for assault with intent to rape and ravish. After a two-day trial, a Lowndes County jury once again found Howard guilty of capital murder with the underlying felonies of rape and arson and again sentenced him to death. It is from this conviction and sentence that Howard prosecutes this appeal.

## STATEMENT OF THE ISSUES

¶13. Howard's first brief, filed by trial counsel Thomas Kesler, consisted of only the following assignment of error:

> **I. WHETHER THE VERDICT WAS AGAINST THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE.**

¶14. By order dated August 21, 2001, we remanded the case for an order regarding appointment of substitute counsel and suspended the briefing schedule during the period the case was remanded. Gary Goodwin and Kesler's trial co-counsel Armstrong Walters[1] were

---

[1]Subsequent to the briefing of the issues in this case, Walters withdrew as counsel when he resigned as public defender, and Carrie Jourdan was appointed to replace him.

appointed substitute appellate counsel and filed a brief asserting the following assignments

of error:

> **II. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A PEREMPTORY INSTRUCTION OF "NOT GUILTY" DUE TO THE INSUFFICIENCY OF EVIDENCE TO SUPPORT THE CONVICTION.**
>
> **III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF PARIS LOWERY FROM HOWARD'S FIRST TRIAL TO BE READ INTO THE RECORD.**
>
> **IV. WHETHER THE TRIAL COURT ERRED IN REFUSING HOWARD'S MOTION FOR MISTRIAL WHEN A PROSECUTION WITNESS STATED THAT HOWARD HAD PREVIOUSLY BEEN IN THE PENITENTIARY.**
>
> **V. WHETHER THE TRIAL COURT ERRED IN REFUSING HOWARD'S PROPOSED JURY INSTRUCTION REGARDING REASONABLE DOUBT.**
>
> **VI. WHETHER THE TRIAL COURT ERRED IN REFUSING TO DECLARE A MISTRIAL DURING THE PENALTY PHASE AND IMPOSE A LIFE SENTENCE UPON THE FAILURE OF THE JURY TO RETURN A UNANIMOUS VERDICT THEREBY ULTIMATELY COERCING A VERDICT OF DEATH FROM THE JURY.**
>
> **VII. WHETHER THE TRIAL COURT ERRED IN FAILING TO INSURE THAT HOWARD RECEIVED A PROPER MENTAL EXAMINATION CONSISTENT WITH THE COURT'S ORDER ENTERED AFTER REMAND ON THE FIRST APPEAL AND WHETHER THIS ERROR WAS**

**COMPOUNDED BY FAILING TO CONDUCT A COMPETENCY EXAMINATION AS SEEMINGLY DIRECTED BY THIS COURT.**

**VIII. WHETHER THE TRIAL COURT ERRED IN ALLOWING FORENSIC ODONTOLOGIST TESTIMONY WHERE THE PRIOR DECISION ON FIRST APPEAL CONDEMNED SUCH SCIENTIFIC EVIDENCE THEREFORE MAKING THE EXCLUSION OF SUCH EVIDENCE THE LAW OF THE CASE.**

¶15.    We also allowed Howard to file a pro se brief on his own behalf wherein he asserts the following issues:

**IX. WHETHER TRIAL COUNSEL WALTERS AND KESLER FAILED TO PROVIDE HOWARD WITH CONSTITUTIONALLY EFFECTIVE ASSISTANCE OF COUNSEL.**

**X. WHETHER THE TRIAL JUDGE MADE IMPROPER FACIAL EXPRESSIONS DURING DEFENSE COUNSEL'S OPENING STATEMENT AND CLOSING ARGUMENT.**

**XI. WHETHER THE OFFICERS INVOLVED IN THE NUMEROUS INTERROGATIONS OF HOWARD FAILED TO READ THE *MIRANDA* WARNINGS PRIOR TO EACH OF THE INTERROGATION SESSIONS.**

**XII. WHETHER THE DISTRICT ATTORNEY AND/OR HIS ASSISTANTS, THE COMMANDER OF THE POLICE DETECTIVES, AND THE CHIEF OF POLICE CONSPIRED TO CONCEAL THE RESULTS OF THE DNA EVIDENCE SENT TO THE STATE CRIME LAB TO BE ANALYZED.**

¶16. Finally, pursuant to Miss. Code Ann. § 99-19-105(2) (2000 & Supp. 2002), we are required to review the proportionality of the death penalty.

> **XIII. WHETHER THE SENTENCE OF DEATH WAS PROPORTIONATE.**

## DISCUSSION

> **I. WHETHER THE VERDICT OF GUILTY WAS AGAINST THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE.**

> **II. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A PEREMPTORY INSTRUCTION OF "NOT GUILTY" DUE TO THE INSUFFICIENCY OF EVIDENCE TO SUPPORT THE CONVICTION.**

¶17. Since these two issues both attack the weight and sufficiency of the evidence, they will be considered together. The Kesler brief couches this assignment of error as an erroneous denial of a motion for judgment notwithstanding the verdict or new trial while the Goodwin/Walters brief couches it in terms of the court's erroneous refusal to grant a peremptory instruction of "not guilty." Either way, the standard for analyzing the sufficiency of the evidence is the same:

> Where a defendant has requested a peremptory instruction in a criminal case or after conviction moved for judgment notwithstanding the verdict, the trial judge must consider all the evidence–not just the evidence which supports the State's case–in the light most favorable to the State. The evidence which supports the case of the State must be taken as true. The State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the

8

defendant with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant is guilty, granting the peremptory instruction or judgment n.o.v. is required. On the other hand, if there is substantial evidence opposed to the request or motion–that is, evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair minded men in the exercise of impartial judgment might reach different conclusions–the request or motion should be denied.

*Gavin v. State*, 473 So. 2d 952, 956 (Miss. 1985) (citations omitted). *See also Moody v. State*, 841 So. 2d 1067, 1092 (Miss. 2003); *White v. State*, 732 So. 2d 961, 966 (Miss. 1999); *Burns v. State*, 729 So. 2d 203, 214 (Miss. 1998); *Nelson v. State*, 722 So. 2d 656, 661 (Miss. 1998); *Cox v. State*, 586 So. 2d 761, 764 (Miss. 1991); *McFee v. State*, 511 So. 2d 130, 134 (Miss. 1987); *Bunkley v. State*, 495 So. 2d 1, 3 (Miss. 1986).

¶18.    Here, the evidence was sufficient to support the conviction even in the absence of fingerprint and DNA evidence. Howard's dentition matched the bite marks found on Kemp's body, he lived two blocks away from Kemp, his former girlfriend testified that he liked to bite her on the breast and neck during intercourse, he smelled of burnt wood or clothes the morning after the murder, and he confessed to Turner that "I had a temper and that's why this happened." The two assignments of error are without merit.

### III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF PARIS LOWERY FROM HOWARD'S FIRST TRIAL TO BE READ INTO THE RECORD.

¶19.    Howard objects to the admission of the former testimony of Paris Lowery on two grounds. First, he argues that the State did not adequately establish that Lowery was

"unavailable" and, second, since we held that Howard did not have adequate representation at his first trial, Lowery's previous testimony was not subject to thorough cross-examination.

¶20.   At the time of Howard's retrial, Lowery was residing in Texas and due to give birth the week of trial.  At a hearing on the possible use of Lowery's former testimony held six days prior to trial the District Attorney's investigator Harry Alderson testified that a subpoena had been issued and returned unserved.  Alderson learned from Lowery's aunt that she had moved to Texas.  Lowery's aunt provided Alderson with Lowery's telephone number in Texas, and, when Alderson called, a person identifying herself as Paris Lowery stated she was due May 21, 2000, the day before trial.

¶21.   Howard's counsel argued that there was no medical confirmation of the pregnancy.  However, Howard did not want a continuance nor was defense counsel able to state any question that it wished to ask Lowery.

¶22.   The State offered to redact any portion of Lowery's testimony to which Howard's counsel objected.  Faced with the prospect of moving forward with Lowery's redacted testimony or granting a continuance to wait until Lowery was able to travel, to which Howard himself repeatedly and quite forcefully voiced his objection, the court held:

> I am in a quandary because the State is seeking to use what it feels should be proper procedures in securing or using the previous testimony of a witness who is unavailable and has held–been held to be unavailable by the Court because of a condition–an illness or a condition such as pregnancy that will cure itself.  Now I know that the State, if the Court rules that this is inadmissible, might be in a posture of requesting a continuance of the matter and that the defendant does not desire

10

that continuance, but defense counsel is placing the Court in the position of entertaining a delay for the purpose of achieving that witness and probably would grant a motion by the State if I felt that that witness's testimony was material to the defendant's guilt or innocence, but I read the testimony of the witness. It was not material as to the defendant's guilt or innocence. It merely introduces the law enforcement officers and the fire department to the scene. It is the first witness that noticed something amiss across the street, but nothing else. There is no indication that I can see that time was of the essence in what this witness said, that is, it was not a critical point as to what time she noticed the smoke in the house across the street, only that she noticed it and had someone call 911 and they arrived shortly thereafter, and I feel that the State's motion for continuance would probably be overruled because I do not think that that is a material fact that the witness would be testifying to, and I do not see how the defendant can be harmed at all by that witness's testimony, and I will allow it to be read into the record. I sustain the State's motion.

Lowery's redacted testimony was read into the record at trial, and the State produced a letter from Lowery's doctor in Baytown, Texas, confirming that she was in fact pregnant and should not travel long distances until the delivery of her baby.

¶23. Former testimony is excepted from the hearsay rule and is defined as:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Miss. R. Evid. 804(b)(1). To use a witness's former testimony, the State must prove the unavailability of the witness by diligent effort. *Naylor v. State*, 759 So. 2d 406, 408-09

11

(Miss. 2000); *Russell v. State*, 670 So. 2d 816, 827 (Miss. 1995); *Mitchell v. State*, 572 So. 2d 865, 869 (Miss. 1990). The court's determination that the State employed a diligent effort will not be disturbed unless the trial court abused its discretion in deeming the witness "unavailable." *Naylor*, 759 So. 2d at 408; *Keyes v. State*, 733 So. 2d 812, 814 (Miss. 1999); *Hennington v. State*, 702 So. 2d 403, 411 (Miss. 1997); *Russell*, 670 So. 2d at 827.

¶24.  Howard cites no meaningful authority in support of his argument. That aside, the trial court did not abuse its discretion. Alderson testified that he spoke with a woman who identified herself as Paris Lowery who stated she was pregnant and due the week of trial. The State subsequently supplemented the record with a letter from Lowery's doctor confirming her pregnancy. Anyway, Lowery's testimony was only that she saw smoke coming from Kemp's house. The court struck the part of Lowery's cross-examination in which she indicated her aunt had seen Howard in the neighborhood. Lowery herself had not seen Howard in the neighborhood, and her testimony was not indicative of Howard's guilt. Her testimony merely set the stage. The assignment of error is without merit.

### IV. WHETHER THE TRIAL COURT ERRED IN REFUSING HOWARD'S MOTION FOR MISTRIAL WHEN A PROSECUTION WITNESS STATED THAT HOWARD HAD PREVIOUSLY BEEN IN THE PENITENTIARY.

¶25.  On two occasions during the trial, Kayfen Fulgham inadvertently stated that Howard had previously been in the penitentiary. Howard contends that the trial court erred in refusing his motion for mistrial.

12

¶26.    Fulgham testified that when Howard returned to Columbus in 1991[2] he lived with his mother and then lived with her in January of 1992.  Howard then moved back in with his mother after he broke up with Fulgham days before the murder.

¶27.    The first reference to the "penitentiary" came on cross-examination by Kesler:

> Q:    Okay.  And Eddie Lee Howard wasn't living anywhere near that area.  Is that correct?
>
> A:    No.  Well, he lived out there at first with his mother on Washington [Avenue] when he first got out of the penitentiary.

¶28.    The second reference came on redirect examination by the District Attorney:

> Q:    Just so the ladies and gentlemen of the jury will understand the sequence, Miss Fulgham, you stated that when he came back he originally moved in with his mother.  Is that correct?
>
> A:    That's right.
>
> Q:    That would have been in October of nineteen ninety-one, is that right?
>
> A:    That's right.
>
> Q:    And where was his mother living in October of nineteen hundred and ninety-one?
>
> A:    On Washington Avenue.
>
> Q:    When did his mother move from Washington Avenue?

_____

[2]Howard had been released from the state penitentiary at Parchman approximately four months before the murder.

A: I'm not sure of the date, but it was maybe a couple of months after he got out of the penitentiary.

¶29. Howard immediately moved for a mistrial after this second reference. The court, after argument, thereafter instructed the jury to disregard as nonresponsive the last answer Fulgham gave.

¶30. Contrary to Howard's contention that the trial court should have immediately declared a mistrial, this assignment of error is without merit because the court instructed the jury to disregard Fulgham's answer. A mistrial is reserved for those instances where a trial court cannot take any action to correct improper occurrences inside or outside the courtroom. *Madere v. State*, 794 So. 2d 200, 214 (Miss. 2001) (citing *Walker v. State*, 671 So. 2d 581, 621 (Miss. 1995)). We have held a jury admonishment to disregard an answer is sufficient in cases where a witness makes an improper reference to a defendant's criminal background. *See, e.g., Smith v. State*, 835 So. 2d 927, 947 (Miss. 2002); *Cox v. State*, 793 So. 2d 591, 595 (Miss. 2001); *Brown v. State*, 534 So. 2d 1019, 1024 (Miss. 1988); *Payne v. State*, 462 So. 2d 902, 905 (Miss. 1984); *Johnson v. State*, 341 So. 2d 660, 662 (Miss. 1977).

V. **WHETHER THE TRIAL COURT ERRED IN REFUSING HOWARD'S PROPOSED JURY INSTRUCTION REGARDING REASONABLE DOUBT.**

¶31. Howard next asserts that the trial court erred in refusing Instruction GPD-2, dealing with reasonable doubt:

The Court instructs the Jury that the doctrine of reasonable doubt is an essential, substantial part of the law of

14

the land, and that it is binding upon the jury in this case; and under law, it is the duty of the Jury to consider all of the testimony in the case fairly and impartially in reaching your verdict; and if after such fair and impartial consideration of the testimony in the case, the minds of the Jury are left in a state of uncertainty as to the guilt of the Defendant, and there arises out of the evidence or from the want of evidence, a reasonable doubt of the existence of a single material fact upon which the guilt of the Defendant depends, then it is the law, that is the duty of the Jury in such case to give the Defendant the benefit of that doubt and to find him not guilty.

Howard argues that the failure to include this instruction left the jury uninstructed as to what to do if they were uncertain as to guilt.

¶32. We have held that where a jury is adequately instructed on reasonable doubt, there is no reversible error for the court to refuse to give a defense instruction on it. *Holloway v. State*, 809 So. 2d 598, 606 (Miss. 2000); *Reynolds v. State*, 585 So. 2d 753, 755-56 (Miss. 1991); *Simpson v. State*, 497 So. 2d 424, 430 (Miss. 1986) (finding jury adequately instructed on reasonable doubt when similar instruction offered). Here, there were other instructions addressing reasonable doubt: Instruction C12 addressed the presumption of innocence; Instruction SGP-3 addressed and defined the elements of capital murder; Instruction SGP-5 addressed and defined the elements of murder; Instruction GPD-3 instructed the jury to resolve doubts in favor of the accused; Instruction GPD-5 instructed the jury to find Howard not guilty if there was reasonable doubt he was not present and did not commit the crime.

¶33. Viewing these instructions as a whole, the jury was adequately instructed on reasonable doubt. This assignment of error is without merit.

> **VI. WHETHER THE TRIAL COURT ERRED IN REFUSING TO DECLARE A MISTRIAL DURING THE PENALTY PHASE AND IMPOSE A LIFE SENTENCE UPON THE FAILURE OF THE JURY TO RETURN A UNANIMOUS VERDICT THEREBY ULTIMATELY COERCING A VERDICT OF DEATH FROM THE JURY.**

¶34. After approximately two hours of deliberation in the sentencing phase, the jury returned a verdict of death. When the jury was polled, all jurors indicated in the affirmative that the verdict of death was their verdict except for the final juror who responded in the negative. The court responded:

> I heard one no in the response of the jury. I will not accept this as the verdict of the jury. Please return this to the jury, along with all of the exhibits. They didn't bring them out; they still have them in their possession.
>
> Ladies and gentlemen, it takes all twelve jurors to concur on a verdict in this case. That also applies to the sentence. It takes all twelve jurors to concur on a verdict. Please retire to the jury room and resume your deliberations. Show the jury back to the jury room.

¶35. Howard's counsel moved the court to sentence Howard to life which the court overruled. The jury returned fifty minutes later with a verdict of death. Upon polling, all twelve jurors concurred.

¶36. Howard argues that the court should have instructed the jury that jurors need not surrender their convictions regarding guilt or innocence and that the court should have reread

16

Instruction SSP-4B, the instruction providing for the elements to be considered, the weighing of mitigating and aggravating circumstances, and the form of the verdict. No objection was ever raised as to the manner in which the judge instructed the jury. Furthermore, Howard's reliance is on *Sharplin v. State*, 330 So. 2d 591 (Miss. 1976), a case dealing with deadlocked juries, and he cites no authority to support his proposition that a mistrial should have been declared.

¶37. The State submits that under Uniform Circuit and County Court Rule 3.10 the judge had two options: "If a juror dissents in a criminal case or in a criminal case if less than the required number cannot agree the court may: 1) return the jury for further deliberations or 2) declare a mistrial." New York law directs a response to this predicament similar to the trial judge's response here. N.Y. Crim. Proc. § 400.27 (McKinney 2003) governs sentencing phases of first degree murder trials and provides that the trial court is not to accept the sentence and is to send the jury back for further deliberations:

> § 400.27    Procedure for determining sentence upon conviction for the offense of murder in the first degree
>
> 1.    Upon the conviction of a defendant for the offense of murder in the first degree as defined by section 125.27 of the penal law, the court shall promptly conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or to life imprisonment without parole. . . .

> 2. The separate sentencing proceeding provided for by this section shall be conducted before the court sitting with the jury that found the defendant guilty. . . .
>
> ***
>
> 11(f). Where a sentence has been unanimously determined by the jury it must be recorded on the minutes and read to the jury, and the jurors must be collectively asked whether such is their sentence. Even though no juror makes any declaration in the negative, the jury must, if either party makes such an application, be polled and each juror separately asked whether the sentence announced by the foreman is in all respects his or her sentence. *If, upon either the collective or the separate inquiry, any juror answers in the negative, the court must refuse to accept the sentence and must direct the jury to resume its deliberation.* If no disagreement is expressed, the jury must be discharged from the case.

(emphasis added).

¶38. The New York statute is silent on whether the trial judge must re-instruct the jury as Howard suggests. The statute is similar to our Rule 3.10 in the sense that the trial judge is authorized to return the jury for further deliberations. Rule 3.10 also does not mandate further instruction when jurors are unable to agree: "If it appears to the court that the jury has been unable to agree, the court *may* require the jury to continue their deliberations and *may* give an appropriate instruction." (emphasis added). The ***Sharplin*** instruction was created to be used in cases where, unlike here, the jury was deadlocked. *See* 330 So. 2d at 596.

18

¶39. The trial judge's above-quoted instructions to the jury that the verdict must be unanimous does not indicate that a death sentence was coerced. There is no Mississippi case law sufficiently on point except for the Court of Appeals' opinion in *Neal v. State*, 806 So. 2d 1151 (Miss. Ct. App. 2002), which declined to address the issue because no contemporaneous objection was made. However, in *State v. Green*, 585 N.E.2d 990 (Ohio Ct. App. 1990), the Court of Appeals of Ohio addressed the very same issue although, admittedly, not in the context of the imposition of a death sentence. In *Green*, the defendant was charged with one count of rape and one count of aggravated robbery. *Id.* at 991. After deliberation, the jury returned a verdict of guilty. *Id.* During polling, Juror No. 1 indicated that she did not subscribe to the verdict, whereupon the court immediately ordered the jury to deliberate further. *Id.* at 991-92. The jury returned a verdict of guilty, and, this time, all jurors acknowledged the verdict. *Id.* at 992. The defendant moved for mistrial which the court denied. *Id.* at 993. On appeal, the Court of Appeals analyzed the denial of the defendant's motion for mistrial under an abuse of discretion standard similar to Mississippi's and held:

> In this case, the appellant's right to a fair trial was not prejudiced by the acknowledgment of Juror No. 1 that the verdict of guilty was not her own verdict. Within forty-five minutes [in this case fifty minutes] of returning for further deliberations, the jury returned a unanimous verdict of guilty which was properly reflected in the *second* jury polling. Thus, the trial court did not abuse its discretion in denying the appellant's motion for mistrial.

*Id.* (emphasis in original).

19

¶40.    Here, the trial judge did not coerce the jury into imposing a death sentence.  Pursuant to Rule 3.10, the trial judge had the choice of sending the jury back for further deliberation or declaring a mistrial.  We recognize that the trial judge was placed in a difficult position, and we can find no reported decision where a Mississippi trial judge has ever been confronted with such a dilemma.  When faced with a juror who questioned his earlier assent to the verdict of death, the trial judge did what was permitted by Rule 3.10 and sent the jury back for further deliberations.  He did not err in doing so, and we will not fault him for failing to give an instruction derived from the situation in *Sharplin*, a case where a jury was unable to reach a verdict and which is easily distinguishable from the situation presented here.

**VII.    WHETHER THE TRIAL COURT ERRED IN FAILING TO INSURE THAT HOWARD RECEIVED A PROPER MENTAL EXAMINATION CONSISTENT WITH THE COURT'S ORDER ENTERED AFTER REMAND ON THE FIRST APPEAL AND WHETHER THIS ERROR WAS COMPOUNDED BY FAILING TO CONDUCT A COMPETENCY EXAMINATION AS SEEMINGLY DIRECTED BY THIS COURT**.

¶41.    In *Howard I*, we found reversible error in the trial court's failure to order a competency hearing before allowing Howard to represent himself.  701 So. 2d at 281.  Howard argues that in this appeal the trial court failed to take heed of our opinion in *Howard I* and that it failed to require his counsel to proceed with an insanity defense.  No authority

20

is cited for the proposition that a trial court can require a defendant to pursue a particular theory of defense. A competency examination was given, and the court noted as much:

> Before I make any rulings on any motions again, I think possibly that that needs to be addressed, and for the record, *Mr. Howard was sent to the Mississippi State Hospital at Whitfield for an examination concerning his competency and a report received from that institution by this Court.* He was sent for that examination because of the supreme court's ruling in the case that he was tried on before and reversed. The supreme court, as I understand it, found in that case that he was incompetent to represent himself or that he was of such competency not to be able to voluntarily waive his rights to assistance of counsel under the Sixth Amendment. *The state hospital has written to this Court and basically told the Court that they found absolutely nothing wrong with Mr. Howard of a psychological nature*, that the mental exam was conducted at the state hospital. . . . *The state hospital at Whitfield was unanimous in their opinion that Mr. Howard had a rational as well as a factual understanding of the nature and subject of the legal proceedings against him and that he has the sufficient present ability to consult with his attorney with a reasonable degree of rational understanding in the preparation of his defense.*
>
> BY THE DEFENDANT: (Mumbling at defense table) I wasn't insane and they knew it.
>
> * * *
>
> BY THE COURT: After they conducted that examination, which by the way, they noted at the state hospital that *it was the fourth known mental health contact with that hospital and they found the same every time*, but regardless of that finding and the previous findings the state supreme court used that as a basis in reversing his prior conviction that he was not competent to represent himself and that he could not proceed pro se.
>
> I do not know Mr. Howard's desires in regards to this retrial insofar as being represented by an attorney or not

21

represented by attorneys, and now is the time for me to find that out before I hear any motions or anything of that nature.

(emphasis added). Counsel never objected to the sufficiency of the evaluation or ever contradicted the characterization of Howard's competency. The trial judge had a complete evaluation of Howard's competency and stated on the record his conclusion that Howard was competent when he ruled on Howard's request that counsel read a prepared opening statement that Howard wrote:

I think that the attorney can state that it is a prepared statement that he is reading to the jury at the defendant's request. At one time I thought that I knew the law on pro se defendants and how those trials are to be conducted. I discovered in the first Howard case that I do not and I am now at a loss as to how to proceed and I think that maybe the best method would be the most cautious method. Therefore, I'm going to advise the defendant of his rights under Rule 8[.]05 of the Uniform Circuit and County Court Rules that concern the election of defendants to represent themselves either partially or totally during the course of a trial and *I'm further going to make a finding in the record that Mr. Howard is competent mentally as I think that I must under the first Howard versus State because in the first Howard v. State the Supreme Court found that he probably was not competent to represent himself mentally or was he competent as an attorney in that representation. The trial court after determining what it could from the first Howard opinion, ordered another mental exam for Mr. Howard to determine his present competency. I was never any–in any doubt as to his competence based on the many hearings that we've had, the many motions that we've had, but after the Supreme Court had made its ruling, I sent him back to Whitfield and they concurred in the trial court's finding, Mr. Howard's competent. There's nothing wrong with Mr. Howard. He suffers from no major mental disease or disorder*. He probably has as much an understanding of the legal procedure and the courtroom procedures as any person not admitted to the bar. He was certainly successful in obtaining a new trial of this matter.

22

[Howard:] Thanks to Armstrong Walters.

BY THE COURT: *And the Court is of the opinion that he is competent. Would I be convinced otherwise, I, of course, would order–order a competency hearing before the case proceeded to trial.*

Again, neither Howard nor his counsel objected to the court's characterization.

¶42. Procedural bar aside, this assignment of error is without merit. In contrast to *Howard I*, the trial judge here had a complete evaluation of Howard's mental capacity. *See Howard I*, 701 So. 2d at 281. *See also **Conner v. State***, 632 So. 2d 1239, 1248 (Miss. 1993) (stating "[t]he real question, therefore, is whether 'reasonable grounds' existed to believe that Conner was insane. If so, then Rule 4.08 [now Rule 9.06] mandates a competency hearing. The determination of what is 'reasonable,' of course, rests largely within the discretion of the trial judge. He sees the evidence first hand; he observes the demeanor and behavior of the defendant."). In fact, the Whitfield report noted that "[t]his was the third Mississippi State hospital contact, the second known forensic mental examination concerning the current charge and the fourth known mental health contact. . . ." Howard's competency was evaluated, evidently more than once, and the judge stated as much on the record. Apparently, no reasonable grounds were present to indicate that Howard was insane which would then necessitate a Rule 9.06 competency hearing. The judge had more than sufficient

23

evidence before him to find Howard competent.[3]  This issue is both procedurally barred and without merit.

> **VIII. WHETHER THE TRIAL COURT ERRED IN ALLOWING FORENSIC ODONTOLOGIST TESTIMONY WHERE THE PRIOR DECISION ON FIRST APPEAL CONDEMNED SUCH SCIENTIFIC EVIDENCE THEREFORE MAKING THE EXCLUSION OF SUCH EVIDENCE THE LAW OF THE CASE.**

¶43.    Howard's attorneys' final argument is that the court erred in admitting Dr. Michael West's testimony when *Howard I* supposedly condemned such evidence.  They further assert that our opinion in *Brooks v. State*, 748 So. 2d 736 (Miss. 1999), which held that bite mark evidence is admissible in Mississippi, is "simply and completely wrong."  In support thereof, their sole authority is then-Justice McRae's dissent in *Brooks* which they quote nearly in toto.

¶44.    In *Howard I*, we did not hold explicitly that bite mark evidence was inadmissible. Rather, we held that "[b]ecause the opinions concerning the methods of comparison employed in a particular case may differ, it is certainly open to defense counsel to attack the qualifications of the expert, the methods and data used to compare the bite marks to persons other than the defendant, and the factual and logical bases of the expert's opinions."  701 So. 2d at 288.  In fact, *Brooks* quoted *Howard I* for the proposition that bite mark evidence

---

[3]Judging from the quality and quantity of motions and correspondence that Howard has written, it is evident that he is mentally competent and has a respectable understanding of the legal process and the nature of the proceedings.

24

would be subject to challenges to weight and credibility by the defense via attacking the qualifications of the expert and the factual and logical bases upon which the expert relied, not that bite mark evidence was inadmissible  748 So. 2d at 739.  Furthermore, in *Brewer v. State*, 725 So. 2d 106, 126 (Miss. 1998) (direct appeal), 819 So. 2d 1169, 1176 (Miss. 2002) (on petition for post-conviction collateral relief), we held twice that Dr. West was qualified and that challenges to his testimony went to weight and credibility, not admissibility.

¶45.    Dr. West testified that Howard's dentition matched the bite marks on Kemp's neck, breast and arm.  Such evidence, following the reasoning of *Howard I*, *Brooks*, and *Brewer*, was admissible, and the trial court did not abuse its discretion in so holding.  We have ruled on more than one occasion that Dr. West's testimony is admissible and that he possesses the knowledge, skill, experience and training necessary to qualify as an expert in forensic odontology.  This assignment of error is without merit.

## IX.    WHETHER TRIAL COUNSEL WALTERS AND KESLER FAILED TO PROVIDE HOWARD WITH CONSTITUTIONALLY EFFECTIVE ASSISTANCE OF COUNSEL.

¶46.    The first argument Howard raises in his pro se brief is the ineffectiveness of his trial counsel.  The specific instance of ineffective assistance, according to Howard, was his counsel's failure to retain an expert in forensic odontology to rebut Dr. West's testimony.  However, Kesler and Walters did consult with a Dr. Richard Souviron in anticipation of Howard's first conviction being reversed.  Dr. Souviron indicated that he would probably concur in Dr. West's findings because of Howard's partial upper denture and the fact that

25

Kemp's body was never exposed to the elements. Howard's attorneys made the tactical decision not to call Dr. Souviron because, according to Kesler, "we didn't want to take the risk of giving the State another expert and an expert that in my opinion [was] more credible than Doctor West. . . ."

¶47. The standard of review is well-settled:

> The standard of review for a claim of ineffective assistance of counsel is a two-part test: the defendant must prove, under the totality of the circumstances, that (1) his attorney's performance was deficient and (2) the deficiency deprived the defendant of a fair trial. *Hiter v. State*, 660 So. 2d 961, 965 (Miss. 1995). This review is highly deferential to the attorney, with a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance. *Id.* at 965. With respect to the overall performance of the attorney, "counsel's choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections falls within the ambit of trial strategy" and cannot give rise to an ineffective assistance of counsel claim. *Cole v. State*, 666 So. 2d 767, 777 (Miss. 1995).

> Anyone claiming ineffective assistance of counsel has the burden of proving, not only that counsel's performance was deficient but also that he was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Additionally, the defendant must show that there is a reasonable probability that, but for his attorney's errors, he would have received a different result in the trial court. *Nicolau v. State*, 612 So. 2d 1080, 1086 (Miss. 1992). Finally, the court must then determine whether counsel's performance was both deficient and prejudicial based upon the totality of the circumstances. *Carney v. State*, 525 So. 2d 776, 780 (Miss. 1988).

26

*Jackson v. State*, 815 So. 2d 1196, 1201 (Miss. 2002). *See also Pruitt v. State*, 807 So. 2d 1236, 1239-40 (Miss. 2002); *Powell v. State*, 806 So. 2d 1069, 1076-77 (Miss. 2001); *Simmons v. State*, 805 So. 2d 452, 479 (Miss. 2001); *Sanders v. State*, 801 So. 2d 694, 702 (Miss. 2001); *Spry v. State*, 796 So. 2d 229, 232 (Miss. 2001).

¶48. Howard cites no authority in support of his assertion of ineffective assistance of counsel. That aside, he also fails to establish both deficient performance and prejudice. The argument that counsel's failure to obtain an expert to counter Dr. West is not only wrong but also is indicative of sound trial strategy. This assignment of error is without merit.

**X. WHETHER THE TRIAL JUDGE MADE IMPROPER FACIAL EXPRESSIONS DURING DEFENSE COUNSEL'S OPENING STATEMENT AND CLOSING ARGUMENT.**

¶49. Howard contends that the trial judge made improper facial expressions of disbelief and disapproval during defense counsel's opening statement and closing argument. No objection was made by either Howard or his two attorneys nor is there any indication whatsoever in the record to indicate as much. This assignment of error is without merit. *See Petro v. State*, 383 N.E.2d 323, 323-24 (Ind. 1978); David E. Rigney, Annotation, *Gestures, Facial Expressions, or Other Nonverbal Communications of Trial Judge in Criminal Case as Ground for Relief*, 45 A.L.R.5th 531 (1997).

**XI. WHETHER THE OFFICERS INVOLVED IN THE NUMEROUS INTERROGATIONS OF HOWARD FAILED TO READ THE *MIRANDA* WARNINGS PRIOR TO EACH OF THE INTERROGATION SESSIONS.**

27

¶50.    Howard argues for the first time that he was interrogated on two occasions shortly after the murder, and that, at each interrogation, the officers failed to read him his *Miranda* warnings.  There is absolutely no substantiation in the record to support such an assertion nor does he provide an instance where evidence obtained as a result of those supposedly improper interrogations was ever admitted at trial.  This assignment of error is without merit.

### XII.    WHETHER THE DISTRICT ATTORNEY AND/OR HIS ASSISTANTS, THE COMMANDER OF THE POLICE DETECTIVES, AND THE CHIEF OF POLICE CONSPIRED TO CONCEAL THE RESULTS OF THE DNA EVIDENCE SENT TO THE STATE CRIME LAB TO BE ANALYZED.

¶51.    Howard finally argues that the District Attorney and police conspired to frame him.  His sole evidence is a Columbus newspaper article stating that Columbus Police Chief Edward Bowen had indicated that DNA evidence was sent to the FBI crime lab.  He further alleges that Commander Freshour told the District Attorney that no DNA analysis was run.  Howard is correct in alleging that no DNA analysis was run.  However, there was no DNA testing because there was no DNA sample to be tested.  This assignment of error is without merit.

### XIII.    WHETHER THE SENTENCE OF DEATH WAS PROPORTIONATE.

¶52.    Pursuant to Miss. Code Ann. § 99-19-105 (2000 & Supp. 2002), we are required to review the proportionality of the death penalty:

> (3)    With regard to the sentence, the court shall determine:

(a)     Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

(b)     Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

(c)     Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

(d)     Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

¶53.    There is no evidence that the sentence was imposed under the influence of passion or prejudice. Howard argues that the court's sending the jury back for further deliberations after one juror indicated in the negative during polling if the verdict was their verdict; however, we held that, as discussed above in Issue VI, the court did not abuse its discretion nor coerce a death sentence in sending the jury back for further deliberations.

¶54.    On the hand, there is evidence supporting the finding of the aggravating factors. The jury found that the murder was committed while in the commission of a rape and arson. The finding of rape was supported by Dr. Hayne's finding of injuries to Kemp's vaginal vault, and the arson was supported by evidence of two small fires which burned holes completely

through the floor in Kemp's house. Also, the fact that Kemp suffered vaginal injuries, multiple scrapes and bruises about her body, and two stab wounds satisfies the Miss. Code Ann. § 99-19-101(5)(h) requirement that the crime be "especially heinous, atrocious, or cruel." Finally, Howard had been previously convicted of two felonies involving the use or threat of violence, namely, convictions in 1972 for assault with the intent to ravish and 1977 for assault with intent to rape and ravish. He had been released from Parchman approximately four months prior the murder. *See* Miss. Code Ann. § 99-19-101(5)(b).

¶55. None of the Miss. Code Ann. § 99-19-101(6) mitigating circumstances are present. Howard has a history of prior criminal activity, the offense was not committed while Howard was under the influence of extreme emotional or mental disturbance, Kemp was not a participant in Howard's conduct, Howard was not an accomplice and played a relatively minor role, Howard did not act under extreme duress or substantial domination of another, Howard's capacity to appreciate the criminality of his conduct was not substantially impaired, nor was his age of forty-one years a factor.

¶56. Howard also presented no evidence in mitigation. He responded to the trial judge's instruction that he had the right to testify during the sentencing phase if he wished to do so. Howard responded, "Your Honor, I understand by the law that [] the prosecutor supposed to prove all three element of the crime. He didn't prove anything, no DNA, no nothing. So [] I don't see no reason for me to say anything further. My lawyers have did the best possible job." Attorney Kesler also obtained a short recess to go search for Howard's mother and

30

sister who had attended the beginning of the trial. After Kesler was unable to locate Howard's family, the trial judge stated, "since there is to be no proof and evidence presented by the defense either, are you still of a mind that you do not need to make an opening statement to tell the jury what your proof and evidence might consist of?" Howard responded, "That's correct."

¶57.    We do not find that Howard's counsel's failure to provide evidence in mitigation to be constitutionally ineffective assistance of counsel. The Fifth Circuit has held that "[t]he failure to present a case in mitigation during the sentencing phase of a capital trial is not, per se, ineffective assistance of counsel. This court has often upheld decisions not to put on mitigating evidence where the decision resulted from a strategic choice." *Stringer v. Jackson*, 862 F.2d 1108, 1116 (5th Cir. 1988), *vacated and remanded sub nom. on other grounds*, *Stringer v. Black*, 503 U.S. 222, 112 S. Ct. 1130, 117 L. Ed. 2d 369 (1992). *See Williams v. Cain*, 125 F.3d 269, 277 (5th Cir. 1997) (quoting *Stringer*); *Williams v. State*, 722 So. 2d 447, 450 (Miss. 1998) (citing *Williams v. Cain*); *See also McGilberry v. State*, 843 So. 2d 21, 30 (Miss. 2003). It is clear that defense counsel wished to have Howard's mother and sister testify in mitigation. The inability to locate them may evidence a want of preparation on defense counsels' part; however, it is plain from the record that Howard did not want them to testify. In response to Kesler's announcement of his plan to call Howard's mother and sister, Howard stated, "They–they won't be here. They–they know every–the

31

whole story." Other than family members, there is nothing else in the record or even suggested by the record of any potential mitigating evidence.

¶58. Compared to other cases, the sentence of death here is not excessive or disproportionate. *See, e.g.*, **Mitchell v. State**, 792 So. 2d 192 (Miss. 2001) (affirming sentence of death where defendant beat, strangled, sexually assaulted, and killed victim by running over her with his car); **Hughes v. State**, 735 So. 2d 238 (Miss. 1999) (affirming sentence of death based on purely circumstantial evidence where defendant beat, raped, stabbed and strangled 16-year-old victim then set victim's chest on fire after she was dead); **Gray v. State**, 728 So. 2d 36 (Miss. 1998) (affirming sentence of death where defendant kidnaped 79-year-old victim, forced her to withdraw money from her bank account, raped her, shot her in the face with a shotgun, and ran over her with her own car); **Crawford v. State**, 716 So. 2d 1028 (Miss. 1998) (affirming sentence of death where defendant abducted, handcuffed, raped and stabbed victim). Georgia Kemp was beaten, strangled, bitten three times, raped, stabbed twice, and left to die in her house which was then set on fire. The punishment is proportionate to the crime. See attached Appendix.

## CONCLUSION

¶59. We find no reversible error. Thus, we affirm the judgment entered by the Lowndes County Circuit Court in accordance with the verdict of guilty of capital murder and sentence of death.

¶60. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH, AFFIRMED.**

**PITTMAN, C.J., SMITH, P.J., DIAZ, EASLEY AND CARLSON, CONCUR. COBB, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶61. The "expert odontology testimony" of Dr. West should not have been submitted to the jury as it is "junk science" and not generally accepted by the scientific community as required by then Rule 702 of the Mississippi Rules of Evidence and *Frye v. United States*, 293 F.1013 (D.C. Cir. 1923). Likewise, neither Dr. West nor his "junk science" meet the standards and requirements for admission under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and revised Rule 702 of the Mississippi Rules of Evidence. Furthermore, the trial court erred in its comments and actions during the penalty phase, following the jury poll which revealed one member of the jury had not indeed reached a verdict in favor of death. Howard's conviction and sentence should be reversed and a new trial ordered.

I.

33

¶62.    Bite mark identification is not a reliable discipline and lacks generally recognized criteria or methodology.  This Court has recognized that there are serious disagreements in the forensic scientific community about whether a defendant can be uniquely identified on the basis of teeth marks.  *See* ***Brooks v. State***, 748 So.2d 736, 739 (Miss. 1999); ***Howard v. State***, 701 So.2d 274, 288 (Miss. 1997).   Critics of bite mark identification have found that the forensic odontology community is not convinced of the reliability or credibility of such science.   ***State v. Ortiz***, 502 A.2d 400, 403 (Conn. 1985); ***People v. Milone***, 356 N.E.2d 1350, 1356 (Ill. App. Ct. 1976); ***Howard***, 701 So.2d at 288; ***Spence v. Texas***, 795 S.W.2d 743, 750-51 (Tex. Crim. App. 1990); Faigman, Kaye, Saks & Sanders, Modern Scientific Evidence: The Law And Science Of Expert Testimony, § 24-1.0, at 157-58 (West 1997).[4] Areas of bite mark identification which are still the subject of disagreement in the forensic odontology community include: (1) the timing of the bite mark injury; (2) enhancement procedures and techniques (such as the use of ultraviolet light); (3) the type of material for test bites or the accuracy of test bites under various mockup conditions; (4) the pressure necessary to produce the various levels of tissue injury under normal and unusual circumstances; (5) manipulation of and various types of distortion to produce correction; (6) whether in fact another set of teeth could have produced the same or similar marks; (7) no universal agreement on which injuries are bite mark related; and (8) research on the minimum number of points of concordance or the minimum number of teeth marks needed

---

[4]   *See also* ***Brooks v. State***, 748 So.2d at 748.

in a bite mark for certainty is also not well established. ***Brooks***, 748 So.2d at 748 n.2 (citing Faigman, Modern Scientific Evidence, § 24-2.3, at 178-80).

¶63. Additionally, Dr. West himself has been a controversial character in the field of forensic odontology. On several occasions, Dr. West has been held to have exaggerated the reliability of his disciplines and has proceeded to testify outside the scope of his expertise. *See* ***Stubbs v State***, 845 So.2d 656, 669 (Miss. 2003); ***Brooks***, 748 So.2d at 749-50; ***Brewer v. State***, 725 So.2d 106, 126 (Miss. 1998). In fact, in 1994, the American Academy of Forensic Science instituted an ethics investigation against Dr. West with regard to testimony he had given during a murder trial here in Mississippi. Ultimately, Dr. West was given the opportunity to resign from the organization before being expelled. Since that time, Dr. West has been allowed to re-enter the organization. During a hearing, Dr. West stated that he has testified seventy-five times. Those seventy-five times break down to forty-one murder trials; thirty-two times as a wound pattern expert; one time as a trace metal expert; three times as an expert regarding gun shot residue; three times as an expert in gunshot reconstruction; three times as a death investigator expert; two times as a County Coroner; six times in child abuse trials; three times as a crime scene investigator; and one time as a blood splatter expert. He also asserts that he has made 600 dental I.D's and 300 bite mark I.D.'s. Of the 100 board certified forensic odontologists in the United States, about 90% of them have testified for the opposite side when Dr. West is called as an expert witness.

35

¶64.    The admission of Dr. West's testimony as to the bite marks found on the victim was governed by then Rule 702 of the Mississippi Rules of Evidence and *Frye*,  293 F. 1013.[5] Then Rule 702 stated in relevant part that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

M.R.E. 702.  Under this rule, two requirements must be met before an expert may testify: (1) the scientific, technical, or specialized knowledge must assist the trier of fact; and (2) the witness must be qualified as an expert by knowledge, skill, experience, training, or education.   Furthermore, under *Frye*, the scientific principles from which the expert's opinion is derived "must be sufficiently established to have gained general acceptance in the field to which it belongs."    293 F. at 1014. *See also* M.R.E. 702 cmt.  In determining whether the field of knowledge has gained "general acceptance," the Court must consider whether "the field of expertise [is] one in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion." *House v. State*, 445 So.2d 815, 822 (Miss. 1984).  *See also*  M.R.E. 702 cmt; *Hardy v. Brantley*, 471 So.2d 358, 366 (Miss. 1985).

¶65.    Under these principles, Dr. West's testimony should not have been admitted, since the methodology and procedure employed for bite mark identification are not generally

_____

    [5]   Since Howard's trial, Rule 702 has been revised.    The revisions and their application will be discussed further in this opinion.

accepted.  As state earlier, the scientific community, specifically the forensic odontology community, has not accepted Dr. West's methodology and testing techniques.  *See **Brooks***, 748 So.2d at 739; ***Howard***, 701 So.2d at 288; Faigman, Modern Scientific Evidence, §§ 24-1.0 at 157-58, 24-2.3 at 178-80.  This Court has recognized that the methodology and techniques used by Dr. West are criticized and scrutinized by the scientific community.  *See **Brooks***, 748 So.2d at 739; ***Howard***, 701 So.2d at 288.  With these revelations, how can this Court stand by and allow Dr. West to testify and give an opinion as an expert to procedures, methodology, and testing which have not been adopted by his own scientific community?

¶66.  As evidence of the persistent problems with Dr. West's methodology regarding bite mark identification, one doesn't have to look any further than this record.  As illustrated below, there are many holes in Dr. West's methodology and opinion:

(1)  Dr. West rests his theory of identification on the fact that teeth have characteristics which make them unique.  When a certain number of these characteristics are present, he opines that he can make an identification of the bite marks and thereby exclude or include the defendant as a suspect.  Under the present facts, Howard was wearing a partial denture, since he was missing his four front teeth.  It is common knowledge that partial dentures of this nature are mass produced by manufacturers.  In forming his opinion and singling out Howard as the person likely to have produced the bite marks on the victim, Dr. West never researched the type of partial dentures worn by Howard or contacted the manufacturer to find out how many sets of that particular model had been produced and distributed in the area of the crime.  Such statistics and information were no doubt needed for Dr. West's determination that Howard indeed likely produced the bite marks;

37

(2)     The victim was killed on February 2, 1992. An autopsy was performed the following day on February 3, 1992. During this time, a funeral and burial were held for the victim. She was not embalmed but was handled by those who prepared her for burial. On February 6, 1992, dental impressions were taken of Howard's teeth. On February 7, five days after her death, the victim's body was exhumed. Dr. West reports that the dental impressions left on the victim were identifiable despite the fact that the victim's body had deteriorated for five days and had been handled by numerous individuals in anticipation of burial;

(3)     During the fire, the victim's body was removed by a Columbus firefighter. Battalion Chief of the Columbus Fire Department, Stanley Clark, testified that in removing the victim from the fire, one of his men "sort of bragged at her shoulders and arm." Dr. West in purporting that the bite marks left on the victim's right arm and upper back were preserved and capable of identification, did not account for any injuries and distortion that may have been caused by the removal of the victim's body;

(4)     On cross-examination, Dr. West acknowledged that skin stretching often does affect or distort a bite mark. However, in examining the bite marks on the victim, Dr. West did not account for any skin stretching despite the fact that the victim had undergone an autopsy, been buried without embalment, and been exhumed;

(5)     Dr. West testified that statistically one out of every five bite marks has enough clarity and detail to allow for possible identification. The other four-fifths are only capable of rendering it consistent or inconsistent. Dr. West testified that the victim had a bite mark on her right arm; the base of her neck on the right side where the shoulder and neck meet; and above her right breast near the nipple area. The bite mark on the victim's right arm only contained upper teeth imprints which were "dragged across her skin." Despite little detail and distortion, Dr. West testified that these marks were "consistent" with Howard's teeth. As to the bite marks on the victim's neck, Dr. West found that the upper and lower teeth had left

38

indentations. He also acknowledged that bite marks in this area of the body are easily distorted due to skin type, muscle type, and possible flexion during the actual bite. He found these marks to be "consistent" with Howard. The bite marks on the victim's breast only showed the upper teeth. Dr. West still found the bite mark to be "consistent" with Howard.

(6) On cross-examination, Dr. West acknowledged that skin type does affect the clarity and detail of a bite mark. The victim was eighty-four years old and it can easily be deduced that her skin type is not that of a younger individual with easily impressionable skin. Despite the victim's skin type, Dr. West purports that the bite marks are still consistent with Howard;

(7) When asked on cross-examination what the margin of error is in determining bite mark identification, Dr. West responded that there is no margin of error since "it's a subjective art and science." Dr. West asserts that the victim's bite marks are consistent with Howard but is unable to give any testimony as to a margin of error; and

(8) Dr. West purports that bite mark identification is relative to "inclusion" and "exclusion." He says that "consistency" as used in bite mark evidence means that "it is possible it could have been made by him." He characterizes all three bite marks found on the victim to be "consistent" with Howard. Later on during testimony, Dr. West begins to move away from his "consistency" characterization and just flat out states that when comparing the bite mark on the victim's right breast he found them to be "identical," and further stated that "in reasonable medical certainty the teeth of Eddie Lee Howard inflicted the bite mark that I found on the right breast of Mrs. Georgia Kemp." Dr. West went beyond "consistency" and entered the realm of "he did it."

¶67. It is clear that this Court's ruling concerning bite mark evidence goes too far and gives little guidance or checks with regard to such testing and subsequent testimony. Even with DNA evidence, we require an independent control check of any materials or regents used in

the performance of the test; the running of known control samples in parallel with the unknown samples to check for errors in test performance; and the calculation of the statistical probability which signifies the statistical probability that a person picked randomly from the population would have a DNA profile identical to the DNA profile generated from the forensic sample. *Polk v. State*, 612 So.2d 381, 393-394 (Miss. 1992); *Taylor v. State*, 889 P.2d 319, 333 (Okla. Crim. App. 1995); Jonathan J. Koehler, *DNA Matches and Statistics: Important Questions, Surprising Answers*, 76 Judicature 222, 224 (1993); Michael Sweeney, *DNA Typing: Defendant a Process under Vigorous Attack*, 21 Cap. U. L. Rev. 611, 643 (1992). Under the methodology employed by Dr. West, there is no statistical probability, no control group, and no check on the materials and regents used in performance. Essentially, there are no independent checks on Dr. West's scientific findings and opinions. He is given free rein to account for himself without any independent confirmation of his methodology or techniques. Furthermore, in his expert opinion testimony the jury is told that the victim's bite mark is "identical" to the teeth of the defendant and is given no statistical probability regarding the margin of error for the techniques employed or the probability that another individual may have left similar bite marks. How can this be? How can Dr. West testify outright that these marks were left by this individual; yet an expert testifying to DNA evidence (the most special and unique makeup of our bodies) is not allowed to testify that the blood is the defendants or the

40

victims, but rather has to give a statistical probability regarding the likelihood that the blood

is the defendant's or victims?  This makes no sense.

¶68.   Even under this Court's recent adoption of revised Rule 702 and *Daubert*, 509 U.S.

579, Dr. West's methodology and opinion will not meet the requirements for expert opinion.

Revised Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, training, or education, may testify thereto
> in the form of an opinion or otherwise; if (1) the testimony is based upon
> sufficient facts or data; (2) the testimony is the product of reliable principles
> and methods; and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

M.R.E. 702 (revised May 29, 2003).  The Comment to the Rule states, in relevant part, that:

> By the 2003 amendment of Rule 702, the Supreme Court clearly recognizes
> the gate keeping responsibility of the trial court to determine whether the
> expert testimony is relevant and reliable.  This follows the 2000 adoption of
> a like amendment to Red. R. Evid., 702 adopted in response to *Daubert v.
> Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  It is important to
> note that Rule 702 does not relax the traditional standards for determining that
> the witness is indeed qualified to speak an opinion on a matter within a
> purported field of knowledge, and that the factors mentioned in *Daubert* do
> not constitute an exclusive list of those to be considered in making the
> determination; *Daubert's* "list of factors was meant to be helpful, not
> definitive."  *Kuhmo [Tire Co., Ltd v. Carmichael]*, 526 U.S. [137], 151
> [(1999)].  See also *Pepitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002).

M.R.E. 702 cmt.  This Court's revision of Rule 702 abandoned *Frye* as the requisite holding

concerning the  admissibility of expert testimony and adopted *Daubert* as its new standard.

¶69.   In *Daubert*, the United States Supreme Court was called upon to review whether

unpublished though credentialed witnesses, who testified that the drug Bendectin had caused

41

birth defects in animal studies, were qualified as experts for the purposes of Rule 702's

"general acceptance" test. 509 U.S. at 582-583. The Court found that the *Frye* "generally

acceptance" test was displaced by the adoption of revised Rule 702 of the Federal Rules of

Evidence. *Id.* at 598-599. In so holding, the Court stated that Rule 702 requires that the

subject of the expert's testimony must be "scientific . . . knowledge." *Id.* at 590. Scientific

"implies a grounding in the methods and procedures of science." *Id.* Knowledge "connotes

more than subjective belief or unsupported speculation." *Id.* "Proposed testimony must be

supported by appropriate validation - - i.e., 'good grounds,' based on what is known." *Id.*

"In short, the requirement that an expert's testimony pertain to 'scientific knowledge'

establishes a standard of evidentiary reliability." *Id.* To meet the requirements of

admissibility under Rule 702, the Court stated that:

> Faced with a proffer of expert scientific testimony, then, the trial judge must
> determine at the outset, pursuant to Rule 104(a), whether the expert is
> proposing to testify to (1) scientific knowledge that (2) will assist the trier of
> fact to understand or determine a fact in issue. This entails a preliminary
> assessment of whether the reasoning or methodology underlying the testimony
> is scientifically valid and of whether that reasoning or methodology properly
> can be applied to the facts in issue. . . . Many factors will bear on the inquiry,
> and we do not presume to set out a definitive checklist or test. But some other
> general observations are appropriate. Ordinarily, a key question to be
> answered in determining whether a theory or technique is specific knowledge
> that will assist the trier of fact will be whether it can be (and has been) tested.
> "Scientific methodology today is based on generating hypotheses and testing
> them to see if they can be falsified; indeed, this methodology is what
> distinguishes science from other fields of human inquiry." E. Green & C.
> Nesson, Problems, Cases, and Materials on Evidence 649 (1983). See also C.
> Hemphel, Philosophy of Natural Science 49 (1996) ("[T]he statements
> constituting a scientific explanation must be capable of empirical test"); K.
> Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37

(5th ed. 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability.") (emphasis deleted).

Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, see S. Jasanoff, The Fifth Branch: Science Advisors as Policymakers 61-76 (1990), and in some instances well-grounded but innovative theories will not have been published, see Horrobin, The Philosophical of Innovation, 263 JAMA 1438 (1990). . . . The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error. see, e.g., *United States v. Smith*, 869 F.2d 348, 353-354 )CA7 1989) (surveying students of the error rate of spectrographic voice identification technique), and the existence and maintenance of standards controlling the technique's operation, see *United States v. Williams*, 583 F.2d 194, 1198 (CA2 1978) (noting professional organization's standard governing spectrographic analysis), cert. denied 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979). Finally, "general acceptance" can yet have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within the community." *United States v. Downing*, 753 F.2d 1224, 1238 (CA3 1985). See also 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[03], pp. 702-41 to 702-42 (1988). Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique which has been able to attract only minimal support with in the community." *Downing*, 753 F.2d, at 1238, may properly be viewed with skepticism. . . .

Throughout, a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules. . . . Judge Weinstein has explained: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." Jack B. Weinstein, FEDERAL RULES DECISIONS 1991 RULE 702 OF THE FEDERAL RULES OF EVIDENCE IS SOUND; IT SHOULD NOT BE AMENDED, 138 F.R.D. 631, 632 (West 1991).

509 U.S. at 592-95.

¶70.    With the application of the principles established in *Daubert*, it is clear that Dr. West's expert opinion does not meet the standards governing admissibility under revised Rule 702. First, "scientific knowledge" implies some sort of objective rather than subjective standard of measurement and means of assessment. *See Daubert*, 509 U.S. at 590. Dr. West, through his own testimony acknowledged that bite mark identification is not governed by an objective standard but rather is a "subjective art and science" with no computable margin of error.

¶71.    Second, scientific testimony must be based on "good grounds," - - i.e. "what is known." *See Daubert*, 509 U.S. at 590. As stated earlier, the forensic odontology community is still in discussions as to whether the methodology and procedures used by Dr. West are sincerely grounded in good science and reliable, therefore Dr. West's methodology is not grounded in "what is known." *See Brooks*, 748 So.2d at 739; *Ortiz*, 502 A.2d at 403; *Howard*, 701 So.2d at 288; *Spence*, 795 S.W.2d at 750-75; *Milone*, 356 N.E.2d at 1356; Faigman, Modern Scientific Evidence, § 24-1.0, at 157-58.

¶72.    Third, Dr. West's methodology cannot meet the criteria requirements as provided in *Daubert*. Dr. West's methodology and procedure have to a small degree been tested. During his testimony, Dr. West repeatedly emphasized the studies done by Dr. Reider Sognnaes at UCLA which studied and compared the dental impressions of 100 twins to determine whether the dental imprints of these twins were distinguishable and identifiable

44

by detailed and unique characteristics. He offered no other studies where the margin of error has been calculated for forensic bite mark identification. Dr. West only continually emphasized that each dental impression is unique to an individual without any other evidence of studies which support his methodology and techniques. Furthermore, it was never revealed whether the UCLA study Dr. West emphasized used the same methodology and techniques employed by himself. Likewise, Dr. West has conducted no independent blind control group studies to verify his techniques or methodology. Additionally, the techniques and methodologies employed by Dr. West are "not capable" of being calculated with a margin of error as "it's a subjective art and science." Dr. West, in his own words, acknowledges that his procedures and methodology are subjective and no margin of error has been calculated to determine how often he is right or wrong. This fact alone tells a lot about Dr. West's so called science. Also, despite this Court's finding that bite mark evidence is "generally accepted," Dr. West's methodologies, procedures, and techniques are not generally accepted in the forensic odontology community. Dr. West himself acknowledges that many of the forensic odontologists that testify regarding bite mark evidence do not agree with his methods. Despite Dr. West's failure to meet the two requirements of *Daubert* discussed above, his theories, methods, and procedure have been subjected to peer review by way of publication. However, publication does not mean that his peers have actually concurred in his methodology and accepted it as a general procedure for bite mark identification. Under the three factors enunciated in *Daubert*, the methodology

and procedures used by Dr. West in forming his so called expert opinions are not admissible under revised Rule 702.

¶73. Additionally, Rule 403 of the Mississippi Rules of Evidence also supports the exclusion of Dr. West's opinion testimony. Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M.R.E. 403. Under Rule 403, the probative value of Dr. West's testimony does not outweigh the unfair prejudice and possible misleading of the jury. Dr. West all but tells the jury "Howard did it." Despite his efforts to limit his testimony to "consistency," Dr. West during testimony characterized Howard's dental impressions as "identical" to those found on the victim.

II.

¶74. Another reason for reversal lies in the trial judge's comments and failure to properly instruct the jury once it was revealed through a jury poll that the jury was not unanimous in the sentencing phase. The jury began sentencing deliberations at 11:00 a.m. From 12:30 p.m till 1:32 p.m. the jury took a lunch break at which time they were instructed not to discuss the case. From 1:32 p.m. till 2:15 p.m. the jury continued deliberations. The verdict for the sentence of death was read. The jury was then polled. It was then that it was discovered that one juror indicated that it was not his verdict. The following then took place:

46

BY THE COURT: I heard one no in the response of the jury. I will not accept this as the verdict of the jury. Please return this to the jury, along with all the exhibits. They didn't bring them out; they still have them in their possession.

Ladies and gentlemen, it takes all twelve jurors to concur on a verdict in this case. That also applies to sentence. It takes all twelve jurors to concur on a verdict. Please retire to the jury room and resume your deliberations. Show the jury back to the jury room.

(JURY OUT AT 2:25 P.M.)

BY THE COURT: I expect you have a motion.

BY MR KESLER: Your Honor, the defendant moves the Court to end the deliberations showing that, uh, Mr. John Hill, Jr. indicated in open court that was not his verdict and for the Court to find that this jury has been unable to resolve the issues and proceed to sentence the defendant to death.

BY THE COURT: The motion is overruled. Court is in recess awaiting the verdict of the jury.

At 3:15 p.m., around forty-five minutes after returning for further deliberations, the jury returned with the verdict of death.

¶75. Rule 3.10 of the Mississippi Uniform Rules of Circuit and County Court Practice, provides in relevant part that:

> If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and he may give an appropriate instruction.
>
> If it appears to the Court that there is no reasonable probability of agreement, the jury may be discharged without having agreed upon a verdict and a mistrial granted. . . .
>
> If a juror dissents in a criminal case or in a civil case if less the required number cannot agree the court may:

47

> (1) return the jury for further deliberations or
>
> (2) declare a mistrial.

To this end, we have reviewed and reversed convictions based on comments similar to those made under the present circumstances.

¶76.    In *Sharplin v. State*, 330 So.2d 591, 595 (Miss. 1976), the jury deliberated for an hour and forty minutes, then informed the trial judge that it had not reached a verdict on the charge of manslaughter.   It was revealed that the jury was divided nine to three.  *Id.*  Upon this finding,  the trial judge stated:

> Well, the jury has been considering this case now for about an hour and thirty, thirty-five minutes.  The Court feels this jury should be able to get together on this case, and I am going to let you go back to the jury room and deliberate some further.  Let the jury go back to the jury room.

*Id.*   Thirty minutes later the jury returned a verdict of guilty.  *Id.*   We held that "the possibility of coercion, if any, lies in the trial judge's conduct and comments after he receives the division, that is, whether the judge merely affords the jury additional time to deliberate or whether he attempts to force a verdict by suggestive comments or coercive measures."  *Id.* at 596.  "If the trial judge feels that there is a likelihood that the jury might reach a verdict, he may return the jury for further deliberations by simply stating to the jurors: 'Please continue your deliberations,' or he may give the following instruction set forth in the tentative draft of Mississippi Mode Jury Instructions: Criminal, Volume 1, page 50."  *Id.*  This instruction simply states:

I know that it is possible for honest men and women to have honest different opinions about the facts of a case, but, if it is possible to reconcile your differences of opinion and decide this case then you should do so.

Accordingly, I remind you that the court originally instructed you that the verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view of reaching agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous, but do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Please continue your deliberations.

*Id.*

¶77. Further, in *State v. Taylor*, 544 So.2d 1387 (Miss. 1989), we were faced with another similar situation. After a full trial, the jury deliberated and returned a verdict of not guilty to the charge of Grand Larceny. *Id.* at 1388. The verdict was rendered and was filed in the minutes of the Court. *Id.* Thereafter, during a jury poll, it was discovered that one juror did not agree with the verdict. *Id.* The Court then ordered the jury to continue deliberations. *Id.* After thirty more minutes of deliberation, the jury returned a verdict of guilty. *Id.* In instructing courts in the future as to the appropriate actions under the circumstances, we provided the following:

(1) After a signal from a jury, the court may order the jurors assembled in open court and inquire of them if a verdict has been reached;
(2) Upon an affirmation of its question, the court should inquire if the verdict is, in fact, the verdict of each member of the jury;
(3) Upon an affirmation of the jury, the verdict should be handed to the court for the judge to ascertain whether or not it is in proper form and responsive to the issues;

(4) The verdict should then be read in open court;

(5) The prosecution and defendant may be asked if either desires a poll of the jury;

(6) The poll, if requested, may be taken, and

(7) Only thereafter, the court should order the verdict filed by the Clerk.

If there is a negative response to (2) or to (6) above, the court would have two options. It can either return a jury for further deliberations under the aegis of Rule 5.14, Unif.Crim.R.Cir.Ct.Prac., or it may of its own motion or of either party direct a mistrial pursuant to the paragraph (3) of Rule 5.15 of the Uniform Criminal Rules.

544 So.2d at 1389.

¶78. Neither of the above cases involved the sentence of death, for which even greater scrutiny should be given. Under the facts and circumstances of this case, the trial judge had two options: (1) return the jury for deliberations with a *Sharplin* instruction; or (2) declare a mistrial. Before Howard even had time to object to the limited instructions given to the jury or even move for a mistrial; the trial judge had already made up his mind and sent the jury back for deliberations. Howard never even had a chance to invoke *Sharplin*. The jury had already been sent back for further deliberations. The appropriate action for the trial judge should have been to:

(1) Allow the defendant to make appropriate motions;

(2) Rule upon those motions;

(3) Decide which option he deemed appropriate–i.e. further deliberations with *Sharplin* instruction or declare a mistrial; and

(4) If the trial judge chose the first option of returning the jury for further deliberations, then he should have given the appropriate *Sharplin* instruction.

The trial judge failed to do any of the above; therefore, the death verdict in the sentencing phase should be reversed.

## III.

¶79.   Dr. West's testimony should not have been admitted as it does not comply with the requirements of former Rule 702 and *Frye* or the requirements of revised Rule 702 and *Daubert*.   Further, the trial judge erred in failing to allow the defense time to make motions and object when it was discovered that the jury in fact had not reached a sentencing verdict and the trial judge erred by failing to give a *Sharplin* instruction when he sent the jury back for further deliberations.   Howard's conviction and death sentence should be reversed and this case remanded for a new trial.

¶80.   For these reasons, I dissent.

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Walker v. Sate,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*, 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).   *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

**Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

**Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

**Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

\**Jones v. State*, 517 So. 2d 1295 (Miss. 1987)*, Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.  2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

  \* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

# DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Flowers v. Sate,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

**DEATH CASES REVERSED AS TO GUILT PHASE**

**AND SENTENCE PHASE**

(**continued**)

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## <u>FOR RESENTENCING TO LIFE IMPRISONMENT</u>

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

   *****Shell v. State**, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi***, 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State*** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

   *****Pinkney v. State**, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi,*** 494 U.S. 1075 (1990) vacating and remanding, ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

   *****Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

   *****Jones v. State**, 517 So. 2d 1295 (Miss. 1987), ***Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

**DEATH CASES REVERSED AS TO
PUNISHMENT AND REMANDED FOR A NEW TRIAL
ON SENTENCING PHASE ONLY**
(continued)

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).  * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.