# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-KA-00965-SCT

*CURTIS LEE NELSON*

*v.*

*STATE OF MISSISSIPPI*

## <u>ON MOTION FOR REHEARING</u>

| | |
|---|---|
| DATE OF JUDGMENT: | 07/30/93 |
| TRIAL JUDGE: | HON. RICHARD T. WATSON |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | TIM D. BLALOCK |
| | L. H. ROSENTHAL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: WAYNE SNUGGS |
| DISTRICT ATTORNEY: | RONNIE HARPER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/29/98 |
| MOTION FOR REHEARING FILED: | 12/4/97 |
| MANDATE ISSUED: | |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. The present case was considered by this Court in *Curtis Lee Nelson v. State*, No.93-KA-00965-SCT (decided November 20, 1997). After full consideration, we grant the State's Motion for Rehearing. The original opinions are withdrawn and these opinions are substituted therefor.

¶2. Curtis Lee Nelson was convicted of the murder of Georgia Mae Evans by an Adams County Circuit Court jury in July of 1993. Feeling aggrieved, Nelson appealed to this Court, raising as his sole issue whether the verdict of the jury was against the overwhelming weight of the evidence.

## I.

¶3. Georgia Mae Evans was brutally attacked on the morning of July 1, 1992. She died as a result of multiple stab wounds. Curtis Lee Nelson was indicted on November 2, 1992 for her murder.

¶4. The trial consisted of a number of witnesses who gave circumstantial evidence of Nelson's guilt. Patricia

Johnson, the victim's oldest sister, testified that she knew from her daily visits with her sister that Nelson was infatuated with Georgia Mae and wanted to marry her. Georgia Mae, on the other hand, feared Nelson and wanted to keep him away from her. Georgia Mae had previously called the police regarding her fear of Nelson. After last seeing her sister around 10:45 p.m. on June 30, 1992, Johnson discovered Georgia Mae's body the next morning. At Nelson's trial, Johnson testified that a letter she found in Georgia Mae's purse was in her sister's handwriting. The letter, dated May 19, 1992 and addressed to someone named Michael, stated that Georgia Mae "couldn't let some kind of fool mess up [her] life." She stated in the letter that it had been a long time since this person had been involved in her life, but that he had called her and told her that she did not have a "damn soul." According to the letter, Nelson had told Georgia Mae that if he could not have her, nobody could. Nelson was married with children.

¶5. Jacqueline Jackson, the victim's other sister, testified that she knew that Georgia Mae was afraid of Nelson. Jackson testified that she told Georgia Mae to buy a pistol, but she refused. Jackson knew that her sister had been in a relationship with Nelson which ended in 1991. She also knew that her sister had been recently involved in another relationship with someone else. Jackson also identified the letter found in the victim's purse as being in her sister's handwriting. In addition, Jackson remembered Nelson coming by her sister's home once, but not being allowed to come up to the house. She also testified that her sister's new boyfriend had temporarily stopped seeing Georgia Mae due to Nelson's threats.

¶6. Janet Baldwin, Georgia Mae's cousin, testified that she was visiting with Georgia Mae about a week and a half prior to Georgia Mae's death when the telephone rang. Georgia Mae answered the phone and told Baldwin to pick up the phone to listen. When Baldwin did, she heard Nelson state, "Ms. Evans, stick your pretty little head out of the door so I can see your pretty face." When the victim refused to come outside, Baldwin testified that Nelson stated, "Georgia Mae, don't have me come up there and kill you." Baldwin told Georgia Mae to hang up the phone. Baldwin then ran to the front of the house where she saw Nelson come by Georgia Mae's house. Baldwin identified Nelson as the person whose voice she heard on the phone that day.

¶7. Brenda Albert, a long time friend of the victim, testified that Nelson once came to Georgia Mae's home, parked his truck, and told one of Georgia Mae's twin children to come and get some money. Georgia Mae did not allow the child to go.

¶8. Jimmie Johnson testified that he had known Georgia Mae and Nelson quite well. According to Johnson, Nelson came by Johnson's house a few weeks prior to Georgia Mae's death and told him that he dreamed that one of Georgia Mae's boyfriends had broken into her house and stabbed and killed her. Johnson further testified that Nelson told him that he caught a boy in Georgia Mae's bed, and when Georgia Mae asked the boy to get her mother because Nelson was being violent, Nelson threatened, "Well, if he do, I'll kill him."

¶9. Hobie Rhines testified that he had been dating Georgia Mae, whom he had met previously at the church they both attended. Rhines testified that in May of 1992, a few weeks prior to the murder he was spending the night with Georgia Mae. They were awakened by a phone call which Georgia Mae answered. Rhines fell back asleep but was awakened shortly thereafter when he saw Georgia Mae and Nelson coming through the bedroom door. Nelson was being very abusive to Georgia Mae, and she was trying to get away from him. Nelson threw her on the bed and Rhines jumped up and began to get dressed.

¶10. Rhines further testified that Georgia Mae had told him that she was not dating anyone else and

specifically that she was not dating Nelson. Rhines watched Georgia Mae struggle with Nelson as she attempted to use the telephone to call her mother. Nelson would not allow her to use the phone. Georgia Mae told Rhines that he should leave and she asked him to get her mother. Rhines testified that he overheard Nelson say to Georgia Mae, "I told you what's going to happen if I catch you with another man here." Though Rhines wanted to help Georgia Mae, his courage failed him because he did not know if Nelson was armed. Thus, he chose not to intervene. After Georgia Mae asked Rhines to bring her mother, Nelson told him, "I'll kill you if you do." Nevertheless, Rhines did fetch Georgia Mae's mother, left the residence and never returned that night. This incident occurred in May of 1992, a few weeks before the murder.

¶11. Dr. Steve Haynes, a qualified forensic medical expert, testified that Georgia Mae died as a result of multiple stab wounds. He performed an autopsy and found twenty-three stab wounds, seven slash wounds, and four puncture wounds. Haynes further testified that the identified murder weapon was a large knife. The triangular wounds observed on the victim were consistent with a large single-edged weapon. The deepest wound to the victim's body was about four or five inches into her body cavity. There was also evidence establishing that Georgia Mae had attempted to protect herself by using her hands to cover her face, neck, and upper chest area. Haynes also testified that the fresh puncture wound found on Nelson's thigh was similar in nature to the wounds inflicted upon Georgia Mae and that Nelson's wound could have been made with a similar triangular-shaped weapon.

¶12. Jacqueline Posey, Georgia Mae's friend and former schoolmate, testified that she was aware that Georgia Mae feared Nelson because Georgia Mae told her so in late May. Posey also saw Nelson leaving Georgia Mae's house one day when the police came. Further, Posey testified that she had seen bruises on Georgia Mae's left arm in May 1992, a few weeks prior to her death.

¶13. Robert Lee Dawson, an investigator with the Natchez Police Department, was present when Nelson was asked to remove his clothes. Dawson saw a fresh puncture wound on his left thigh. A photograph of this wound was entered into evidence.

¶14. Barbara Miller, a Natchez Police Department employee, went to Nelson's house on July 1, 1992. She asked Nelson's wife for his most recently removed clothes. Nelson's wife gave Miller a pair of pants and a shirt. Miller turned the clothes over to another detective for analysis.

¶15. Detective Tom McGehee received a call on July 1, 1992 reporting Georgia Mae's death. McGehee videotaped Georgia Mae's home, particularly the condition of the room where she was found. Detective McGehee testified that test of semen found in the victim's body could have come from either Rhines or Nelson. However, Rhines testified that he last visited Georgia Mae on June 30, 1992 and that they had not been sexually intimate on that evening.

¶16. Mike Mullins testified that he was notified of the homicide at approximately 6:45 a.m. He accompanied Captain Eaton to the Vidalia Police Department, where they picked up Nelson. Nelson voluntarily returned to Natchez. Nelson was given his *Miranda* rights, and after he signed a waiver of those rights and the right to assistance of counsel, the officers questioned him.

¶17. During the questioning, Nelson stated that he was Georgia Mae's boyfriend. He claimed that they had a good relationship until he caught her with another man in her house. Nelson also claimed that he did not visit Georgia Mae's house after she told him to stay away. He stated that the man, whom he found in

Georgia Mae's house, was named Mike or Michael and that this had occurred a couple of months prior to the murder. Nelson further stated that he once told the victim that he "ought to get that machete out and cut her neck off." On the day of the murder, however, Nelson claimed that he had gone to Marsaw's for breakfast at 5:00 a.m. When questioned about the fresh wound on his thigh, Nelson claimed that he wounded himself on his truck door, stating that there was chrome on the vehicle's door.

¶18. Mullins found no one at Marsaw's who had seen Nelson on July 1, 1992. Mullins further stated that Nelson never asked why he was being questioned and showed no emotion when they told him that Georgia Mae had been murdered.

¶19. At the close of the State's case, Nelson moved for a directed verdict. In denying the motion, the trial court stated the following:

> The Court has heard the evidence. While the State concedes it is a circumstantial case, the Court is particularly impressed with the fact that the defendant and the deceased had intimate relations involving sexual activity for a number of years. At this point, it is undisputed that this relationship was broken off by the decedent sometime prior to the date of death. After the relationship was attempted to be terminated by the deceased, the defendant made threats to kill the decedent and others, or at least one other; that he made trips by the house of the decedent. And it's undisputed evidence that he kept peeping through the windows that necessitated the putting up of aluminum foil around the windows; that he had been guilty of physical abuse . . . prior to the date of the alleged murder and has been pointed out the key point of the State's evidence that on the morning of the murder, law officers determined that the defendant had suffered an injury to his right thigh. An expert, Dr. Haynes, testified that this injury was inflicted similar to, not the instrument, that was used in the murder of the decedent, which in his opinion was something similar to a kitchen knife or butcher knife. The Court reiterates that strong evidence, circumstantial in nature, is that the defendant threatened the life of the decedent prior to this incident, and did, in fact, physically abuse her. Based upon all of the evidence as counsel stated including eighteen witnesses and sixteen exhibits, the Court feels that the State has made a strong circumstantial evidence case in this regard and the facts justified submission of this case to the jury as a question of fact to be determined by the jury. Therefore, the motion for a directed verdict is overruled.

¶20. Based upon the preceding evidence, the jury found Nelson guilty of murder, and he was sentenced to life imprisonment. On August 5, 1993, Nelson filed a motion to set aside the verdict and for a new trial. It was denied on August 9, 1993.

## II.

¶21. "The *corpus delicti* in a homicide case consists of (1) the death of a human being, and (2) a criminal agency causing the death." **May v. State**, 524 So. 2d 957, 966 (Miss. 1988) (quoting **Miskelley v. State**, 480 So. 2d 1104, 1107 (Miss. 1985)). The State may prove the crime (*corpus delicti*) by circumstantial evidence, but where a case is based wholly on circumstantial evidence, the State must prove the defendant's guilt "beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence." **Leflore v. State**, 535 So. 2d 68, 70 (Miss. 1988); **Montgomery v. State**, 515 So. 2d 845, 848 (Miss. 1987); **Westbrook v. State**, 202 Miss. 426, 433, 32 So. 2d 251, 251 (1947).

¶22. The standard used in assessing a motion for judgment notwithstanding the verdict was clearly set out

by this Court in *Pharr v. State*, 465 So. 2d 294 (Miss. 1984). There, we noted that such motions test the legal sufficiency of the evidence supporting the verdict of guilty. These motions renew the defendant's request for a peremptory instruction that was made at the close of all the evidence. Such a motion asks the court to hold, as a matter of law, that the verdict may not stand. *Id.* at 301. When a defendant moves for a judgment notwithstanding the verdict, "the trial court must consider all of the evidence--not just the evidence which supports the State's case--in the light most favorable to the State." *May v. State,* 460 So. 2d 778, 781 (Miss. 1984). The State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. *Glass v. State*, 278 So. 2d 384, 386 (Miss. 1973).

¶23. If the facts and inferences so considered favor the defendant with sufficient force that reasonable people could not have found him guilty beyond a reasonable doubt, the motion for judgment notwithstanding the verdict must be granted. On the other hand, if there is substantial evidence opposing the motion, that is, evidence of such quality and weight which could cause reasonable fair-minded people in the exercise of impartial judgment to reach different conclusions, the motion should be denied and the jury's verdict allowed to stand. *May*, 460 So. 2d at 781.

¶24. In other words, once the jury has returned a verdict of guilty in a criminal case, this Court is not at liberty to direct that the defendant be discharged, short of a conclusion on our part that the evidence, taken in the light most favorable to the verdict, is such that no reasonable juror could have found the defendant guilty beyond a reasonable doubt. *Pharr*, 465 So. 2d at 301; *Hester v. State*, 463 So. 2d 1087, 1093 (Miss. 1985) ("While keeping in mind that each circumstantial evidence case turns on its own facts, and that it is peculiarly within the jury's province to draw reasonable inferences based upon its own experience and common sense, we have previously rejected the concept of guilt by association").

¶25. In the instant case, the trial court denied Nelson's motion for a directed verdict because the evidence established the following:

1. that Nelson and Georgia Mae Evans had engaged in an intimate, sexual relationship for a number of years;

2. that Georgia Mae had ended the relationship prior to her death;

3. that Nelson threatened Georgia Mae and others;

4. that Nelson continued to go to Georgia Mae's home;

5. that Nelson kept peeping in Georgia Mae's windows causing her to cover them with aluminum foil;

6. that Nelson physically abused Georgia Mae prior to her death;

7. that police officers found an injury on Nelson's right thigh on the day of the murder which could have been inflicted by the murder weapon;

8. that Dr. Haynes testified that Nelson's injury was inflicted by an instrument similar to the one which killed Georgia Mae;

9. that semen taken from the decedent's body excluded 91% of black males but failed to exclude Nelson; and

10. that Nelson described to a friend, a few weeks prior to Georgia Mae's death, exactly how she would die.

## III.

¶26. Our review of the evidence in the instant case supports the jury finding of Nelson's guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.

¶27. In *Parker v. State*, 606 So. 2d 1132 (Miss. 1992), a case very similar to the case *sub judice*, this Court held:

> On a question of overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Only when the verdict of the jury is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will we disturb that verdict on appeal.

*Parker*, 606 So. 2d at 1140 (citations omitted).

¶28. Nelson also asserts there was no evidence of motive presented to the jury. Contrary to these assertions, there was evidence of motive and opportunity as well as a pattern of threats and harassment. There was a fresh wound on Nelson's thigh made by the same type weapon used to brutally stab Georgia Mae to death. The semen could not exclude Nelson from having had sexual intercourse with Georgia Mae immediately prior to her death.

¶29. Moreover, there was evidence of Nelson lying as to his harassing and threatening Georgia Mae. The evidence is very clear that Nelson continued to try to see Georgia Mae even though she continued to protest his coming around her, her children, or her house. Clearly sufficient evidence existed in the record to find Nelson guilty of the murder of Georgia Mae Evans.

¶30. We have held:

> [I]f there is substantial evidence opposed to the request or motion that is evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair minded men in the exercise of impartial judgment might reach different conclusions - the request or motion should be denied.

*Gavin v. State,* 473 So. 2d 952, 956 (Miss. 1985); *May v. State*, 460 So. 2d 778, 781 (Miss. 1984); *see also Winters v. State*, 449 So. 2d 766 (Miss. 1984). The evidence in this case, supports the jury's verdict.

¶31. **CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PRATHER, C.J., PITTMAN, P.J., ROBERTS, SMITH AND WALLER, JJ., CONCUR. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND McRAE, J.**

**BANKS, JUSTICE, DISSENTING:**

¶32. Boiled down to its essentials, the case against Nelson is that he had threatened the victim, had a motive to kill her and couldn't supply an alibi. Additionally, there was evidence that Nelson was brutal, threatening and dangerous. In my view that is not enough to convict a person beyond a reasonable doubt in the absence of some connection to the scene of the crime or the implement of death. Accordingly, I dissent.

¶33. There was no evidence that put Nelson at the murder scene. The evidence did establish that based on the time-line of the murder, Nelson had the opportunity to commit the murder in the sense that he did not prove that he was elsewhere at the time. Nevertheless, the only evidence that could possibly link Nelson to the murder scene was the doctor's testimony that the wound on Nelson's thigh "could" have been made by a similar weapon. That is, the wound was made by a triangularly shaped instrument, like many, if not most, sharp instruments are shaped.

¶34. The State argues that Nelson's explanation for the thigh wound was contradicted by the testimony of Officer McGehee. The officer testified that he visually inspected Nelson's truck and found nothing that would indicate that Nelson could have injured himself on the car door as he claimed. This testimony hardly proves that it did not happen. More importantly it does not prove that the wound occurred at the murder scene, or that it was inflicted with the murder weapon.

¶35. The evidence showed that Evans, the victim, had recently had ***consensual*** sexual intercourse. However, the semen samples were not proven to be Nelson's. The State established that it was possible that it was Nelson's. However, it was also possible that it was Evans' boyfriend, among others. More importantly, there is nothing to connect this consensual sexual episode with the murder.

¶36. This Court will reverse a criminal conviction unless the evidence proves guilt beyond a reasonable doubt and to the exclusion of all reasonable hypotheses of innocence. In the past we have been compelled to reverse convictions where "the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." ***Johnson v. State***, 642 So. 2d 924, 928 (Miss. 1994); *see also* ***Hicks v. State***, 580 So. 2d 1302, 1305 (Miss. 1991). I would do so in this case.

**SULLIVAN, P.J., AND McRAE, J., JOIN THIS OPINION.**