897 So.2d 1002 (2004)
Lolan Ray SMITH, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2003-KA-00065-COA.
Court of Appeals of Mississippi.
December 7, 2004.
Rehearing Denied March 29, 2005.
*1003 William C. Stennett, Tupelo, attorney for appellant.
Office of the Attorney General by Scott Stuart, attorney for appellee.
Before LEE, P.J., CHANDLER and GRIFFIS, JJ.
*1004 CHANDLER, J., for the Court.
¶ 1. A Lee County jury found Lolan Smith guilty of the murder of his grandson. The circuit court sentenced Smith to life imprisonment. Smith appeals, and argues that the lower court erroneously denied his motion for a JNOV or a new trial and erroneously refused his proffered circumstantial evidence jury instruction.
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. The following information is taken from the evidence presented at the trial. Lolan Ray Smith and Shelby Jean Smith were divorced on the basis of irreconcilable differences on December 3, 2000. Shelby purchased a house with funds received in the divorce settlement. Smith and Shelby's grandson, twenty-seven-year-old Matthew Smith, also moved into the house. Fourteen days later, on the rainy evening of January 18, 2001, the house burned down.
¶ 4. When the fire began, Shelby was in her bedroom and Matthew was in the living room. Shelby heard a loud sound and ran to her bedroom door. Matthew came into the hall and yelled to her that the house was on fire. Shelby went into the hall and saw that the kitchen was on fire. She escaped out of the front door. Matthew went to his bedroom and called 911, but hung up before speaking. That call was received at 7:52 p.m. Shelby went back into the house three times to find Matthew, but she was injured by the fire and had to run out of the house each time. Matthew died of smoke inhalation.
¶ 5. Shelby went to the nearby home of her granddaughter, Tracy Pearson. Pearson called 911 at 8:06 p.m. and reported the fire. The Lee County Sheriff's Department responded. Mike Ivy, a fire investigator, was notified of the fire at 9:09 p.m. Ivy assisted in removing Matthew's body from the house. The next day, he determined that the fire began in the rear of the house. He determined that the fire had been caused by someone pouring gasoline into the house beginning in the kitchen and backing up through the utility room and onto the back porch outside, then igniting the fumes with an open flame device. Ivy collected several gasoline samples from the dirt underneath the porch. Ivy excluded all other possible causes of the fire.
¶ 6. No witness saw anyone start the fire, and no fingerprints were found at the scene because of the fire damage. Investigator John Hall stated that it had not been feasible to search for incriminating footprints because it was a rainy night and many people had trampled the ground. After taking initial statements, Hall decided to arrest Smith. Smith was at home and considerably intoxicated at the time of his arrest. The clothing Smith was wearing tested negative for the presence of gasoline. The gasoline container used by the perpetrator was never located.
¶ 7. Smith lived 1.7 miles away from Shelby, which was approximately three to four minutes away by car. Several witnesses testified that Smith's heart condition and health problems would have prevented him from walking to Shelby's house and back. However, Smith had a car and was capable of driving.
¶ 8. Witnesses testified that on several occasions Smith had threatened to burn down Shelby's house and kill Shelby and Matthew, and that he had offered people money to burn down homes where Shelby was living, including those of his own daughters. Shelby testified that, on May 5, 2000, she had a fight with Smith in which he said he would kill her and burn her house down. She fled to her daughter's house, and Smith followed on a tractor *1005 and threatened to run her down. Shelby separated from Smith and moved to a safe house. She said that Smith had previously threatened to kill Matthew.
¶ 9. Tracy Pearson testified that, two months before the fire, Smith told her that if he had anything to do with it, Shelby would come out of the divorce "with nothing, not even her life." He also said that he would kill Matthew if he saw him, and that he had a pair of spark plug wires waiting to use to beat him to death.
¶ 10. John Humphries worked at Smith's automobile body shop during the fall of 2000. At that time, Shelby was living at the homes of her two daughters. Humphries stated that he and Smith drank all day together at the shop and that other men gathered there for drinking. Humphries said that Smith made daily threats to kill Shelby or "burn her out." He said that one morning Smith asked him if he would be interested in making some money, and said he would give Humphries $500 per house to burn the houses of his daughters and of a neighbor. Another time, Smith offered Humphries $500 to "mess up" a pickup truck belonging to his son-in-law. Humphries refused these offers. Once, Smith said that his friend Michael George had planned to introduce Smith to someone willing to burn the properties, but that the plan had fallen through. Humphries had considered Smith's statements to be merely "drunk talk," but became worried that other people at the shop to whom Smith communicated his desires might take Smith seriously and harm Shelby's property.
¶ 11. Michael George was Smith's nephew. He testified that, six months before the fire, Smith asked him if he would burn Smith's daughter's house because Shelby was living there. George refused. Smith said that he would kill Shelby before she got any of the things he had worked for. Smith had been drinking heavily. George thought Smith was serious and informed Shelby.
¶ 12. David Posey testified that, about a month before the fire, Smith offered him $500 to burn down Shelby's house. Later, he offered him $30,000 to burn it down. Posey refused. On both occasions, Smith was so drunk he could barely walk.
¶ 13. At noon on the day of the fire, Smith told Sandra Kitchens that he wanted to burn down Shelby's house using starter fluid and chimney stacks. Then he said, "to hell with it, I'm just going to pour gas on it and be done with it." At the time, Kitchens and Smith were smoking marijuana.
¶ 14. Around 3:30 p.m. that day, Smith had a conversation with his friend, Sergeant Larry Grissom with the Tupelo Police Department. Grissom stated that Smith, intoxicated, complained about the divorce settlement and said that he was going to see his wife and grandson suffer, on their knees begging for their lives, and if it was the last thing he did, he was going to see them in their graves. Smith also said that it was going to cost him $30,000 to have them taken care of, but it was well worth it. Grissom had two prior encounters with Smith when Smith was brought to jail for domestic violence and public drunkenness, and on both occasions Smith stated that he was going to kill his wife if it was the last thing he ever did.
¶ 15. Theresa Minor testified that she saw Smith on the morning of the fire and that he was heavily intoxicated. Smith called her between 6:00 and 7:00 p.m. and asked her to bring him some whiskey. She called Smith between 7:30 and 8:00 p.m. to see if he had any steak sauce. Smith called her between 8:15 and 8:20 p.m. He said something about an alibi and that Theresa needed to tell people that he *1006 was home that night. At around 8:20 or 8:22 p.m., Theresa and her husband Mack went to Smith's house and brought him a bottle of whiskey. Smith was sitting in his recliner and was intoxicated; he drank some of the whiskey. Smith said that his sister-in-law Sharon had called him and said that Shelby's house was on fire. Smith told Theresa that she might have to tell the authorities she had talked to him on the phone several times that evening.
¶ 16. Mack Minor testified that Theresa talked to Smith two or three times between 6:00 p.m. and 8:00 p.m. that night. He testified that Theresa's call to Smith about the steak sauce occurred between 6:00 and 6:30 p.m. Mack and Theresa testified that they became wet in the rain when going to Smith's house. There were no wet or muddy footprints on Smith's porch. Smith's hair and clothes were dry when they arrived. They were there when Smith was arrested, and he asked them to lock up the house and turn off the lights. While doing this, they went throughout the house and did not notice any wet or muddy footprints or clothes. Smith's car was parked at his house.
¶ 17. Tom Allen testified that Smith called him close to 8:00 p.m. Smith said he was drunk and asked Allen to come get him. Smith said that something had happened and that he did not do it but would be blamed for it, and that he needed an alibi.
¶ 18. Smith gave a statement to the police the day after his arrest. Smith admitted that he had wished Shelby's house would burn and that he had talked about it. He denied asking anyone to set the house on fire or offering anyone money to set it on fire. He stated that he never left his house on the evening of the fire.
¶ 19. At the trial, Smith contradicted his earlier statement by denying that he ever told anyone he wished Shelby's house would burn down. He maintained that the only time he ever mentioned fire was when he expressed the wish that he and Shelby could burn their jointly owned property rather than fighting over the property division. He denied ever threatening to kill Shelby or Matthew. He denied that he set the fire and said that he had spent the evening drinking wine by himself.
¶ 20. Smith was indicted for arson and capital murder. After deliberating for eight hours, the jury found Smith guilty of murder and he was sentenced to life imprisonment.

LAW AND ANALYSIS

I. WHETHER SUFFICIENT EVIDENCE WAS PRESENTED TO CONVICT THE APPELLANT ON THE INDICTED CHARGE.

II. WHETHER THE COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A DIRECTED VERDICT AT THE CLOSE OF THE ENTIRE CASE, WHETHER THE VERDICT OF THE JURY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND CONTRARY TO THE LAW, AND WHETHER THE COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL.
¶ 21. Smith's first and second issues challenge the sufficiency of the evidence and his second issue also challenges the weight of the evidence. These issues will be addressed together. We begin by reviewing the sufficiency of the evidence, which is attacked by a motion for a directed verdict or a JNOV. McClain v. State, 625 So.2d 774, 778 (Miss.1993). On appellate review of the trial court's denial of the defendant's motion for a JNOV, this Court examines all of the evidence in the light most favorable to the verdict. Wetz v. *1007 State, 503 So.2d 803, 808 (Miss.1987). We consider as true all credible evidence consistent with the defendant's guilt and give the State "the benefit of all favorable inferences that may be reasonably drawn from the evidence." McClain, 625 So.2d at 778. "We are authorized to reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." Id. Assessing the weight and credibility of the evidence is the province of the jury. Id.
¶ 22. Smith's first argument is that the evidence was insufficient to sustain his conviction of the offenses for which he was indicted. We observe that Smith was not convicted of the offenses for which he was indicted, which were arson and capital murder with the underlying felony of arson. Rather, the jury found Smith guilty of deliberate design murder, which the jury was instructed on by the trial court in addition to the indicted offenses. See Miss.Code Ann. § 97-3-19(1)(a) (Rev.2000); Scott v. State, 878 So.2d 933, 966(¶ 91) (Miss.2004). Because Smith actually was acquitted of the offenses for which he was indicted, Smith's argument that there was insufficient evidence of his guilt of arson or capital murder is without merit.
¶ 23. Smith also attacks the sufficiency of the evidence of his guilt of deliberate design murder.[1] Smith contends that no reasonable jury could have concluded beyond a reasonable doubt that Smith was responsible for the fire because there was no physical evidence connecting Smith with the fire, such as muddy footprints or gasoline on Smith's clothes, and the evidence showed that he was at home during the fire and so intoxicated that he could not walk without assistance. Smith argues that, given this evidence, no reasonable jury could find him guilty of murder.
¶ 24. We disagree with Smith's analysis of the evidence and find that the evidence was sufficient to sustain the murder conviction. Ivy testified that the fire was intentionally set. The fire began shortly before Matthew's 911 call at 7:52 p.m. Smith lived within three or four minutes' driving distance of Shelby's house. Theresa Minor testified that she telephoned Smith at his home and talked to him between 7:30 and 8:00 p.m. regarding steak sauce, but her husband testified that the steak sauce call occurred between 6:00 and 6:30 p.m. Regarding Smith's intoxication, the testimony was that Smith was too drunk to walk without assistance only after he consumed the whiskey which Theresa brought after 8:20 p.m., once the fire had already begun. From this evidence, a reasonable jury could infer that, before the fire began, Smith was not too intoxicated to have left his house without assistance and he drove to Shelby's house, started the fire, and returned to his house, and that Smith concealed any physical evidence.
¶ 25. Alternatively, there was credible evidence from which a reasonable jury could have inferred that Smith hired someone *1008 to set the fire. The evidence showed that Smith made several offers to witnesses to burn Matthew's house down and that he stated to Officer Grissom at 3:30 p.m. the day of the fire that it was going to cost him $30,000 to have his wife and grandson taken care of, but that it was well worth it. Moreover, at the trial, Smith totally contradicted his earlier statement to the police and denied that he ever threatened to burn the house down and contradicted his statements to witnesses by denying that he ever offered anyone money to burn down the house. From this evidence, a reasonable jury could have found Smith's version of events to be incredible and found beyond a reasonable doubt that Smith procured someone to set the fire.
¶ 26. Smith also argues that there was insufficient evidence of his deliberate design to effect Matthew's death. Smith characterizes his many threats and offers as merely "drunk talk" that could not reasonably be interpreted as evidence of intent to kill. Smith avers that most of his threats occurred before the divorce, which, he argues, irrefutably showed that any negative feelings he harbored against Shelby and Matthew had dissipated by the time of the fire.
¶ 27. These arguments are without merit. Smith did make significant threats against Shelby and Matthew before the divorce was final on December 3, 1999. However, the testimony of several witnesses indicated that Smith's threats continued unabated after the divorce. The most significant evidence of Smith's deliberate design to kill Matthew was his statement on the morning of the fire, when he told Sandra Kitchens that he was going to burn down Shelby and Matthew's house by pouring gas on it, and his statement to Sergeant Grissom later that day that he was going to see his wife and grandson suffer, that he was going to see them in their graves, and that it was going to cost him $30,000 to have them taken care of. This evidence, together with the testimony concerning Smith's other threats against Matthew and his requests that people burn Matthew's house down, constituted strong evidence from which a reasonable jury could find that Smith possessed a deliberate design to effect Matthew's death. See Russell v. State, 497 So.2d 75, 76 (Miss.1986). Further, the question of whether Smith's statements were indicative of premeditated design or were the harmless ravings of a drunkard was a matter for the jury to weigh. Given the evidence that Smith consistently communicated similar threats and offers, a reasonable jury could have concluded that the statements evinced a deliberate design to effect death.
¶ 28. Smith argues that the trial court mistakenly denied his motion for a new trial. A motion for a new trial challenges the weight of the evidence and implicates the trial court's sound discretion. "The trial judge should not order a new trial unless [the judge] is convinced that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice." Wetz v. State, 503 So.2d 803, 812 (Miss.1987). This Court only will reverse and order a new trial upon a determination that the trial court abused its discretion. In making that determination, we accept as true all evidence in favor of the State. Id.
¶ 29. Smith contends that the "various weaknesses and inconsistencies" in the evidence against him rendered the verdict against the overwhelming weight of the evidence. He argues that the State's witnesses were not compelling or clear, and that some of the testimony was contradictory. We repeat the principle that it is the jury's exclusive role to weigh the *1009 credibility of witnesses and to resolve conflicts in the evidence. Turner v. State, 726 So.2d 117, 125(¶ 29) (Miss.1998). Given the facts discussed above in our analysis of the sufficiency of the evidence, we find that verdict was not against the overwhelming weight of the evidence and that the trial court acted within its discretion in denying Smith's motion for a new trial. See Wetz, 503 So.2d at 813.

III. WHETHER THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S CIRCUMSTANTIAL EVIDENCE JURY INSTRUCTION.
¶ 30. Smith argues that he was entitled to a circumstantial evidence instruction. "[C]ircumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist." Keys v. State, 478 So.2d 266, 268 (Miss.1985). Direct evidence is that which is not circumstantial, such as eyewitness testimony, the defendant's confession to the offense charged, or the defendant's admission as to an important element thereof. Lynch v. State, 877 So.2d 1254, 1265(¶ 23) (Miss.2004). When the prosecution's evidence is wholly circumstantial, the accused is entitled upon request to a jury instruction that, before the jury may convict, it must find that the defendant's guilt of the crime charged has been established beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. Billiot v. State, 454 So.2d 445, 461 (Miss.1984). Because a circumstantial evidence instruction is necessary only when the State's case is entirely circumstantial, a circumstantial evidence instruction is not required when there is both direct and circumstantial evidence of the guilt of the accused. Gilleylen v. State, 255 So.2d 661, 663 (Miss.1971).
¶ 31. At the close of evidence, Smith requested a circumstantial evidence jury instruction to the effect that, to convict Smith, the jury had to find him guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. The trial court found that the State's case comprised a mix of direct and circumstantial evidence against Smith and denied the instruction. In its brief, the State contends that the trial court correctly denied the instruction because the case against Smith was both direct and circumstantial.
¶ 32. This issue requires this Court to determine whether or not the State's evidence against Smith was purely circumstantial. The State argues that Smith's threats constituted direct evidence of his intent to kill Matthew. Prior Mississippi cases have listed threats as among the evidence against the defendant in purely circumstantial evidence cases. Cox v. State, 849 So.2d 1257, 1262-63 (¶ 6, ¶ 10) (Miss.2003); Nelson v. State, 722 So.2d 656, 658, 660 (¶ 6, ¶ 21) (Miss.1998); Luker v. State, 14 So. 259 (Miss.1894).
¶ 33. This prior treatment of threats as circumstantial would be dispositive of this issue if not for other precedent holding that the defendant's admission on a significant element of the offense obviates the need for a circumstantial evidence instruction. Conner v. State, 632 So.2d 1239, 1256 (Miss.1993) (overruled on other grounds); Mack v. State, 481 So.2d 793, 795 (Miss.1985). This precedent was recently approved in Lynch v. State. Lynch, 877 So.2d at 1265(¶ 29). In Lynch, the supreme court stated that "`an admission [is] a statement by the accused-it may be direct or implied-of facts pertinent to the issue and tending in connection with other facts to prove his guilt.'" Id. at 1265 (¶ 23) (quoting Mack, 481 So.2d at 795). Though "not a confession properly so-called," the defendant's admission going to a significant element of the offense is direct *1010 evidence of the defendant's guilt. Id. at 1266 (¶ 29).
¶ 34. In Lynch, the defendant was convicted of capital murder with the underlying felony of robbery for an incident in which Lynch's accomplice killed someone during a car-jacking. Id. at 1260 (¶ 1). During police questioning, Lynch was asked whether he knew his accomplice was going to carjack someone and take the person's car. Id. at 1265 (¶ 24). Lynch responded, "I think so. I really don't know." Id. The court found that it was clear from the context of the police questioning that Lynch's answer expressed what Lynch thought before the car-jacking and murder, not what he learned afterward. Id. at (¶ 25). The court found that Lynch's statement tended to prove his guilt when viewed in connection with the other facts showing Lynch's involvement in the crime. Id. at 1266 (¶ 28). The court concluded that Lynch's response constituted an admission pertaining to the element of intent to commit a robbery and that, due to the admission, the case against Lynch was not purely circumstantial. Id. at (¶¶ 27-29).
¶ 35. As in Lynch, Smith's threats against Matthew and requests that people burn down his house, along with the circumstantial evidence against Smith, tend to prove Smith's guilt. The evidence showed that Smith had the opportunity to burn down Matthew's house because he was at home on the evening of the fire and lived close enough to Matthew's house to be able to drive there and return home before his phone conversations. There was evidence that Smith's body shop was a cash business and Smith carried large amounts of cash, tending to show that Smith had cash resources to have enabled him to pay someone to set the fire. And, Smith's trial testimony contradicted his earlier statements to police and witnesses. Smith's threats and offers evinced his deliberate design to effect death, which is a significant element of murder. The threats and offers were strong evidence that Smith was responsible for the fire which killed Matthew, and together with the other evidence, tended to prove Smith's guilt.
¶ 36. Based on Lynch, we find that Smith's statements before and after the crime about his desire to burn down Matthew's house and to kill Matthew, and his requests that others burn down Matthew's house, constituted admissions on deliberate design, a significant element of murder. Id. at 1266-67 (¶¶ 28-29). Smith's admissions on a significant element of the offense for which he was convicted were direct evidence of his guilt. Id. Therefore, the State's case against Smith comprised a mix of direct and circumstantial evidence and trial court correctly denied Smith's proffered circumstantial evidence instruction.
¶ 37. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.
NOTES
[1] To have found Smith guilty of deliberate design murder, the jury necessarily must have found that Smith set the fire or procured someone else to set the fire which killed Matthew. Yet, the jury acquitted Smith of arson. Though Smith has not attacked any inconsistency in the jury's verdict, we note that "[i]nconsistent or even contradictory verdicts are not, in and of themselves, reasons to overturn a criminal conviction." George v. State, 752 So.2d 440, 443(¶ 20) (Miss.Ct.App.1999). "[T]he courts' review of the sufficiency of the evidence is adequate protection from jury error or irrationality." Holloman v. State, 656 So.2d 1134, 1141 (Miss.1995) (citing United States v. Powell, 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984)).